450 So.2d 822 (1984)
John FASSOULAS, et al., Petitioners,
v.
John R. RAMEY, et al., Respondents.
No. 62220.
Supreme Court of Florida.
January 19, 1984.
Rehearing Denied June 21, 1984.
Arnold R. Ginsberg of Horton, Perse & Ginsberg, and Hawkesworth & Schmick, Miami, for petitioners.
Richard A. Sherman, Fort Lauderdale, and Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, Miami, for respondents.
PER CURIAM.
This cause is before the Court on a decision certified by the Third District Court of Appeal as passing upon a question of great public importance. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. The issue in this case concerns the scope of damages in a "wrongful birth" negligence suit.
Plaintiffs, Edith and John Fassoulas, were married and had two children, both of whom had been born with severe congenital abnormalities. After much consideration, they decided not to have any more children due to the fear of having another physically deformed child and the attendant high cost of medical care. They then decided that John would undergo a vasectomy. This medical procedure was performed in January 1974 by defendant, Dr. Ramey. However, due to the negligence of the defendant in performing the operation, in giving medical advice concerning residual pockets of sperm, and in examining and judging the viability of sperm samples, Edith twice became pregnant and gave birth to two children. The first of these, Maria, was born in November 1974 and had many congenital deformities. Roussi, the *823 second of the post-vasectomy children and the fourth Fassoulas child, was born in September 1976 with a slight physical deformity which was corrected at birth; he is now a normal, healthy child.
The plaintiffs sued Dr. Ramey and his clinic in tort based on medical malpractice for the two "wrongful births." They sought as damages Edith's past and future lost wages, her anguish and emotional distress at twice becoming pregnant, her loss of the society, companionship and consortium of her husband, John's mental anguish and emotional distress, his loss of the society, companionship and consortium of his wife, medical and hospital expenses and the expenses for the care and upbringing of the two new children until the age of twenty-one.
At trial, the jury found in favor of the plaintiffs, finding the defendants 100% negligent with reference to Maria and 50% negligent with reference to Roussi. The plaintiffs were found to be comparatively negligent as to the birth of Roussi. Damages were assessed in the amount of $250,000 for the birth of Maria and $100,000 for the birth of Roussi, the latter sum being reduced to $50,000 because of the plaintiffs' comparative negligence.
Upon appeal, the district court affirmed as to liability but affirmed in part and reversed in part as to damages. Ramey v. Fassoulas, 414 So.2d 198 (Fla. 3d DCA 1982). As to these damages, the district court held: damages for the ordinary rearing expenses, past and future, for both children were not recoverable; damages for the rearing expenses, past and future, for a physically and mentally defective child were recoverable over and above ordinary rearing costs associated with raising a child to age eighteen. The district court remanded for a new trial on the issue of damages only. It also certified the following question:
WHETHER THE PARENTS OF A CHILD, WHO IS BORN AS A RESULT OF A NEGLIGENT VASECTOMY, ARE ENTITLED IN A "WRONGFUL BIRTH" NEGLIGENCE SUIT TO PAST AND FUTURE DAMAGES FOR THE CARE AND UPBRINGING EXPENSES OF THE SUBJECT CHILD AS AGAINST THE TORTFEASOR PHYSICIAN WHO NEGLIGENTLY PERFORMED THE VASECTOMY?
This question is the sole issue for our consideration in this cause; the issue of liability was not appealed to us and for the purposes of this proceeding, liability has been conceded. For the reasons expressed herein, we answer the question as did the district court, holding that ordinary rearing expenses for both a normal and defective child are not recoverable, and only the special expenses associated with raising a defective child to the age of majority are recoverable.[1] We thus approve the decision of the district court below.
The rule in Florida is that "a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child." Public Health Trust v. Brown, 388 So.2d 1084, 1085 (Fla. 3d DCA 1980), petition denied, 399 So.2d 1140 (Fla. 1981) (footnote omitted). "[I]t has been imbedded in our law for centuries that the father and now both parents or legal guardians of a child have the sole obligation of providing the necessaries in raising the child, whether the child be wanted or unwanted." Ramey v. Fassoulas, 414 So.2d at 200. "The child is still the child of the parents, not the physician, and it is the parents' legal obligation, not the physician's, to support the child." Id. For public policy reasons, we decline to allow rearing *824 damages for the birth of a healthy child. As stated by the Supreme Court of Wisconsin:
To permit the parents to keep their child and shift the entire cost of its upbringing to a physician who failed to determine or inform them of the fact of pregnancy would be to create a new category of surrogate parent. Every child's smile, every bond of love and affection, every reason for parental pride in a child's achievements, every contribution by the child to the welfare and well-being of the family and parents, is to remain with the mother and father. For the most part, these are intangible benefits but they are nonetheless real. On the other hand, every financial cost or detriment  what the complaint terms "hard money damages"  including the cost of food, clothing and education, would be shifted to the physician... . We hold that such result would be wholly out of proportion to the culpability involved....
Rieck v. Medical Protective Co., 64 Wis.2d 514, 518, 219 N.W.2d 242, 244-45 (1974) (footnote omitted). We agree with this reasoning and hold that, as a matter of law, the "benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child." Terrell v. Garcia, 496 S.W.2d 124, 128 (Tex.Civ.App. 1973), cert. denied, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); Public Health Trust v. Brown.
The same reasoning forcefully and correctly applies to the ordinary, everyday expenses associated with the care and upbringing of a physically or mentally deformed child. We likewise hold as a matter of law that ordinary rearing expenses for a defective child are not recoverable as damages in Florida.
We agree with the district court below that an exception exists in the case of special upbringing expenses associated with a deformed child. See Moores v. Lucas, 405 So.2d 1022 (Fla. 5th DCA 1981). Special medical and educational expenses, beyond normal rearing costs, are often staggering and quite debilitating to a family's financial and social health; "indeed, the financial and emotional drain associated with raising such a child is often overwhelming to the affected parents." Ramey v. Fassoulas, 414 So.2d at 201. There is no valid policy argument against parents being recompensed for these costs of extraordinary care in raising a deformed child to majority. We hold these special upbringing costs associated with a deformed child to be recoverable.
We approve the decision of the district court below that remanded the instant proceeding to the trial court for a new trial on damages only. With respect to the issue certified to this Court relating to rearing expenses, the trial court will comply with the views heretofore expressed in this opinion. As to the remaining consequential damages that went to the jury, i.e., pain and suffering, lost wages and medical expenses, these were not appealed by the defendants, and we do not address them.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON and McDONALD, JJ., concur.
EHRLICH, J., dissents with an opinion with which ADKINS and SHAW, JJ., concur.
EHRLICH, Judge, dissenting.
I believe the opinion of the district court below, Ramey v. Fassoulas, 414 So.2d 198 (Fla. 3d DCA 1982), which is grounded upon a previous district court opinion that is clearly untenable in its logic, Public Health Trust v. Brown, 388 So.2d 1084 (Fla. 3d DCA 1980), is seriously in error in both its reasoning and holding. Because the present majority opinion adopts the reasoning of the lower court opinion and approves its holding, I dissent.
A brief recitation of the history of this developing area of tort law is necessary in order to show the foundation of my viewpoint. See generally Comment, Busting the Blessing Balloon: Liability for the Birth of an Unplanned Child, 39 Alb.L. Rev. 221 (1975); Note, Remedy for the *825 Reluctant Parent: Physicians' Liability for the Post-Sterilization Conception and Birth of Unplanned Children, 27 U.Fla.L. Rev. 158 (1974); Note, Sterilization and Family Planning: The Physician's Civil Liability, 56 Geo.L.J. 976 (1968).
The first case to consider the rights of parents after an unsuccessful sterilization operation was Christensen v. Thornby, 192 Minn. 123, 255 N.W. 620 (1934). Decided nearly half a century ago, that case involved a plaintiff husband's undergoing a vasectomy to prevent his wife's pregnancy and the resultant endangering of her life (due to difficulties she had had with the birth of a previous child). In spite of the vasectomy, the wife became pregnant. She survived the childbirth with no damage to her health. The husband brought suit for his anxiety and expenses, basing his cause of action on the failure of the operation to fulfill the physician's promise that the operation had been successful. The trial court denied relief and the Minnesota Supreme Court affirmed on the ground that the husband, who pleaded in deceit, had failed to allege the fraudulent intent required to support such an allegation. In language not necessary to the holding, however, the court opined that "[i]nstead of losing his wife, the plaintiff has been blessed with the fatherhood of another child. The expenses alleged are incident to the bearing of a child, and their avoidance is remote from the avowed purpose of the operation." 192 Minn. at 126, 255 N.W. at 622.
This "blessing" dicta was seized upon in Shaheen v. Knight, 11 Pa. D. & C.2d 41 (Pa. 1957). There, in a case of first impression, the court held that a contract to perform a non-therapeutic sterilization operation was not invalid as against public policy even when the reason for the procedure was solely for the purpose of family planning. The court refused to award damages, however, because of the "blessing" that the newborn child, the couple's fifth, would bring to them. "To allow damages in a suit such as this would mean that the physician would have to pay for the fun, joy and affection which plaintiff Shaheen will have in the rearing and educating of this, defendant's [sic] fifth child." 11 Pa. D. & C.2d at 45-46. "He wants to have the child and wants the doctor to support it. In our opinion to allow such damages would be against public policy." Id. at 46. Additionally, the court noted that the parents were not willing to give the child up for adoption, although "[m]any people would be willing to support this child were they given the right of custody and adoption." Id.
Further cases followed this line of reasoning of allowing a cause of action for wrongful conception or wrongful birth[1] but denying recovery as a matter of law on public policy grounds. For example, Terrell v. Garcia, 496 S.W.2d 124 (Tex.Civ. App. 1973), cert. denied, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974), denied damages because "the satisfaction, joy and companionship which normal parents have in rearing a child make such economic loss worthwhile. These intangible benefits, while impossible to value in dollars and cents are undoubtedly the things that make life worthwhile. Who can place a price tag on a child's smile ...?" 496 S.W.2d at 128. In Rieck v. Medical Protective Company, 64 Wis.2d 514, 219 N.W.2d 242 (1974), the court discussed the failure of the parents to place the unwanted child[2] for adoption as an element of the retention of benefits; *826 the court then denied recovery of damages on public policy grounds.
The Florida district court decisions relied upon by the majority opinion fall into this category of denying damages as a matter of law on the basis of public policy considerations. In Public Health Trust v. Brown, the issue was only the scope of damages associated with the birth of a healthy child, not an unhealthy one. The court denied the costs of rearing the child because of the "simple proposition," 388 So.2d at 1085, that a parent has not been damaged by the birth of a normal, healthy child. The backbone of this position is that "it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable `benefits' of parenthood far outweigh any of the mere monetary burdens involved." 388 So.2d at 1085-86 (footnote omitted) (emphasis supplied). Reaching deeper into the public policy arena, the decision states that "[s]peaking legally, this [the benefits] may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the `unwanted' child for adoption." 388 So.2d at 1086. The opinion closes with a stance of satisfaction that "[i]t is a rare but happy instance in which a specific judicial decision can be based solely upon a reflection of one of the humane ideals which form the foundation of our entire legal system." Id. (emphasis supplied).
The instant decision at the district court level relied heavily upon Public Health Trust for its analysis and public policy holding. It analogizes to the law in wrongful death cases in support of its position, pointing out that the recoverable elements of damage are not offset by child rearing expenses, overlooking all the while that those elements of damage are spelled out and controlled entirely by statute and that except for the death statute itself, there would be no cause of action or recoverable damages. It opines that its holding aligns itself with "some of the most fundamental values of our culture which has long honored the institution of the family and cherished the inestimable worth of children." 414 So.2d at 201. It continues that "our children represent the destiny of the country, our best hope for the future, and a treasure beyond compare." Id. It closes with the comment that "our legal institutions are alive and well and equal to the task of dispensing justice with fairness and common sense." Id.
These opinions substitute wise-sounding platitudes for any earnest and frank examination of the relevant issues involved. To deny plaintiffs who have been wronged their just relief based upon alleged "humane ideals" and not to grant relief on the basis of long recognized and well accepted tort principles is unjust and unfair. As the dissent in Public Health Trust so aptly noted,
[T]he result reached by the majority in the name of humaneness is, unwittingly, inhumane. I see nothing humane in denying a parent the wherewithal which might save a child from deprivation or, in many cases, abject poverty. I see nothing humane in a rule of law that could enhance the already dire need of parents and existing siblings. I see nothing humane in a decision which effectively immunizes physicians from their negligence and victimizes a mother who sought to relieve herself and her family from the additional burden of another child.
388 So.2d at 1087 (Pearson, J., dissenting).
The line of cases denying relief as a matter of law on public policy grounds that the Florida district courts have adhered to are eroding away and no longer represent a majority position. See Hartke v. McKelway, 526 F. Supp. 97 (D.D.C. 1981), cert. denied, ___ U.S. ___, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983); Sherlock v. Stillwater Clinic, 260 N.W.2d 169 (Minn. 1977). The new, emerging majority viewpoint is grounded not in result-oriented appeals to public policy but in traditional tort principles. For example, in an opinion by the Minnesota Supreme Court receding from the "blessing" dicta in the original Christensen v. Thornby case, the court stated:

*827 [W]e are not persuaded that public policy considerations can properly be used to deny recovery to parents of an unplanned ... child of all damages proximately caused by a negligently performed sterilization operation. Analytically, such an action is indistinguishable from an ordinary medical negligence action where a plaintiff alleges that a physician has breached a duty of care owed to him with resulting injurious consequences.
Sherlock v. Stillwater Clinic, 260 N.W.2d at 174. Likewise, in Troppi v. Scarf, 31 Mich. App. 240, 187 N.W.2d 511 (1971), a Michigan court noted:
Contraception, conjugal relations, and childbirth are highly charged subjects. It is all the more important, then, to emphasize that resolution of the case before us requires no intrusion into the domain of moral philosophy. At issue here is simply the extent to which defendant is civilly liable for the consequences of his negligence... . [W]e go no further than to apply settled common-law principles.
31 Mich. App. at 244-45, 187 N.W.2d at 513. This we daily do in Florida. As stated in Hoffman v. Jones, 280 So.2d 431, 438 (Fla. 1973), "[i]n the field of tort law, the most equitable result that can ever be reached by a court is the equation of liability with fault." "Where the purpose of the physician's actions is to prevent conception or birth, elementary justice requires that he be held legally responsible for the consequences which have in fact occurred." Sherlock v. Stillwater Clinic, 260 N.W.2d at 174. For the courts to hold otherwise, as do the Florida district courts, is to infringe impermissibly upon a constitutionally-protected fundamental right. See Bowman v. Davis, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976). It is precisely at this juncture that Public Health Trust and Ramey v. Fassoulas take a serious turn into error. Notwithstanding those decisions' moral comments, among others, that children are of inestimable worth and a blessing, is the fact that the right to limit procreation is of constitutional dimension. See Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The choice not to procreate, as part of a person's right to privacy, is constitutionally guaranteed. That, if anything, is the "public policy" that should be determinative in this area of tort law. When the Florida district court opinions meander into comments such as "our children represent the destiny of the country ... [and] our best hope for the future," Ramey v. Fassoulas, 414 So.2d at 201, they ignore the fact that birth control is a well-practiced norm in this country.
The use of various birth control methods by millions of Americans demonstrates an acceptance of the family-planning concept as an integral aspect of the modern marital relationship, so that today it must be acknowledged that the time-honored command to "be fruitful and multiply" has not only lost contemporary significance to a growing number of potential parents but is contrary to public policies embodied in the statutes encouraging family planning.
Stillwater v. Sherlock Clinic, 260 N.W.2d at 175 (footnotes omitted).
To say that for reasons of public policy contraceptive failure can result in no damage as a matter of law ignores the fact that tens of millions of persons use contraceptives daily to avoid the very result which the defendant would have us say is always a benefit, never a detriment. Those tens of millions of persons, by their conduct, express the sense of the community.
Troppi v. Scarf, 31 Mich. App. at 253, 187 N.W.2d at 517.
Turning specifically to the issue of damages, whereas the minority of courts hold as a matter of law that there can be no recovery because of the "blessings" of a child, the modern majority of courts make use of what is known as the Benefits Rule. Restatement (Second) Of Torts § 920 *828 (1979)[3] recognizes a right of recovery but requires mitigation of damages where the interest harmed has also been benefitted. Two points are clearly germane. First, while it may be difficult to ascertain damages, it is not impossible.[4] "While we recognize that the dollar value of the benefits to be offset is difficult to assess, we have routinely allowed recovery for the loss of aid, comfort, and society in wrongful death actions where similar problems of proof are presented." Sherlock v. Stillwater Clinic, 260 N.W.2d at 176.
It may, indeed, be difficult to "place a price tag on a child's smile." But there is no support for the conclusion that the task cannot be performed... .
In any event, the fact that the extent of damages may be difficult to ascertain should not cause the courts to throw up their hands in frustration. Even the dice player who is faced with the admittedly difficult task of rolling a "10" is afforded the opportunity to roll the dice. If he fails, he loses, but the dice are not snatched from his hand with the explanation that the "point" is too difficult to make.
Terrell v. Garcia, 496 S.W.2d at 129 (Cadena, J., dissenting). "Moreover, the claim that damages are incapable of measurement ignores the distinction between uncertainty as to the fact of damage, which precludes recovery, and uncertainty as to the amount of damage, which does not." Note, Wrongful Conception: Who Pays for Bringing Up Baby?, 47 Fordham L.Rev. 418, 430 (1978) (footnotes omitted). "The wrongdoer should not be relieved of liability because the nature of his tortious conduct precludes the ascertainment of the amount of damages with certainty. The problems of uncertainty should be placed on the wrongdoer rather than on the innocent party." Id. (footnotes omitted).
Second, the very strength of the Benefits Rule is its flexibility in case-by-case adjudication.
The essential point, of course, is that the trier must have the power to evaluate the benefit according to all the circumstances of the case presented. Family size, family income, age of the parents, and marital status are some, but not all, the factors which the trier must consider in determining the extent to which the birth of a particular child represents a benefit to his parents. That the benefits so conferred and calculated will vary widely from cases to case is inevitable.
Troppi v. Scarf, 31 Mich. App. at 257, 187 N.W.2d at 519. The trier of fact may properly weigh and consider a full panoply of factors in its determination of how much of a benefit a child is to its parents. Of particular significance is the datum of whether the child is normal in health or physically or mentally impaired. No special rule is thus needed (which the majority opinion fashions) to cover the case of a deformed child. That particular fact, just as if the fact was that the child was of good health, is presented to the trier for its evaluation. No distinction then need be made between ordinary rearing expenses and special expenses.
One point needs to be emphasized concerning the mitigation of damages. I take issue with the language in Public Health Trust that the parents are overwhelmingly benefitted by the birth of the unplanned child and that, "[s]peaking legally, this may *829 be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the `unwanted' child for adoption." Public Health Trust, 388 So.2d at 1086. This is specious reasoning, in my opinion. It is elementary that a tortfeasor takes an injured party as he finds him. If the parents do not wish to undergo an abortion or adoption, then the tortfeasor cannot be heard to complain that his damages are greater than if he had caused a wrongful conception or wrongful birth by a woman who was willing to abort or place a child up for adoption.[5]Troppi v. Scarf. Similarly, relating to the issue of adoption, "to impose such a duty upon the injured plaintiff is to ignore the very real difference which our law recognizes between the avoidance of conception and the disposition of the human organism after conception." Troppi v. Scarf, 31 Mich. App. at 257, 187 N.W.2d at 519.[6] "The suggestion ... that the child be considered as worth its cost or be put out for adoption is not consistent with the very stability of the family which the ... court relies on to support its views of `universal public sentiment'." Custodio v. Bauer, 251 Cal. App.2d 303, 324, 59 Cal. Rptr. 463, 477 (1967). Finally, relating to both abortion and adoption, the doctrine relating to mitigation of damages only requires that reasonable measures be taken. Clearly, it should be a matter of law that to require an abortion or adoption is unreasonable.
It has often been said that hard cases make bad law. I am afraid that the majority opinion does just that. A look at the instant facts supports this conclusion. John and Edith Fassoulas already had two children and both were born with severe medical problems. They could not afford the medical bills arising out of the treatments required. This was partly a function of the high cost of the medical bills and partly a function of the unemployment of John himself because of ill health. The two decided upon the solution of a vasectomy, both for the stated economic reason and for the reason of their fear that any further children might also be born with defects. They went to Dr. Ramey for the vasectomy but the operation was negligently performed. Thereupon occurred what can only be described as a comedy of errors. The fact that the operation was not successful was not apparent to anyone at the time. Edith soon became pregnant but all concerned thought that the cause was Dr. Ramey's negligent instructions to the couple about how long to wait before resuming intercourse and how long to use birth control because of the presence of residual pockets of sperm. In any event, Maria made her appearance nine months later and was congenitally deformed. She had a short neck, an abnormal shaping of the skull, a skin irregularity that was described as fish-like and scaly in appearance, a heart murmur, hypertension, and malformations of the hands. The very result that John and Edith wished to avoid by having the vasectomy was thus visited upon them, clearly a foreseeable consequence of Dr. Ramey's negligence. Time passed. Dr. Ramey once again erred in his professional conduct, this time by negligently confusing sperm viability with sperm motility in his examination of John's sperm samples. John and Edith were told that John was sterile when in fact he was not. Believing that Maria was born because of the residual sperm pockets extant after the initial operation and that John was now sterile, the couple resumed sexual relations. Again, there resulted a surprise, this time Roussi's birth. Though born with minor infirmities, these were corrected and Roussi can be considered a normal child. But now, instead of having only two children with physical infirmities, John and Edith have a total of four children, three with *830 infirmities and one without. There are now medical bills for three deformed children; John is still out of work; and Edith has to quit work in order to care for the four children. All are now on welfare. While Edith and John testified that they love their two unplanned children greatly, (and what parent would not?), they have clearly been wronged by the negligent physician. Can it fairly be said as a matter of law that they have not been damaged by Roussi's birth? Is it fair to say as a matter of law that the non-extraordinary expenses associated with rearing Maria are not recoverable? I think not.
"It is no answer to say that a result which claimant specifically sought to avoid, might be regarded as a blessing by someone else." Rivera v. State, 94 Misc.2d 157, 162, 404 N.Y.S.2d 950, 954 (Ct.Cl. 1978) (emphasis supplied). "The doctor whose negligence brings about ... an undesired birth should not be allowed to say, `I did you a favor," secure in the knowledge that the courts will give to this claim the effect of an irrebuttable presumption." Terrell v. Garcia at 131 (Cadena, J., dissenting).
Dr. Ramey did not do Edith and John a favor. That is what this Court should hold. Since it did not, I must dissent.
ADKINS and SHAW, JJ., concur.
NOTES
[1] The district court opinion stated that "Maria was born mentally retarded," 414 So.2d at 199, in addition to her numerous physical infirmities. Our examination of the record discloses no testimony or other evidence substantiating any finding of mental retardation. Congenital physical abnormalities, on the other hand, are clearly established in the record. The issue of whether, by whom, and under what circumstances, special damages may be recoverable beyond the age of majority if severe infirmities, such as mental retardation, preclude an individual from being self-sustaining as an adult was not raised on this appeal and this is not before us; a decision thereon is neither made nor intimated.
[1] The instant case is technically and properly a "wrongful conception" action, and not a "wrongful birth" or "wrongful life" action. See Sherlock v. Stillwater Clinic, 260 N.W.2d 169 (Minn. 1977).

The distinction between a wrongful life action and a wrongful birth action is that the former is brought by the child, whereas the latter is brought by the parents. Wrongful conception cases are primarily distinguishable from both wrongful life and wrongful birth cases in that the parents in the latter cases want a healthy child, whereas in wrongful conception cases the parents do not want a child at all.
Note, Wrongful Conception: Who Pays for Bringing Up Baby?, 47 Fordham L.Rev. 418, 418 n. 7 (1978).
[2] "This child is not to be thought of as unwanted or unloved, but as unplanned." Jackson v. Anderson, 230 So.2d 503, 503 (Fla. 2d DCA 1970).
[3] § 920. Benefit to Plaintiff Resulting from Defendant's Tort

"When the defendant's tortious conduct has caused harm to the plaintiff or his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."
Restatement (Second) of Torts § 920. "It should be emphasized that the benefits rule involves a question of mitigation after the determination of damages, not a balancing process to determine their existence." Note, Wrongful Conception: Who Pays for Bringing Up Baby?, 47 Fordham L.Rev. 418, 432 n. 110 (1978).
[4] "[D]ifficulty in determining the amount to be subtracted from the gross damages does not justify throwing up our hands and denying recovery altogether." Troppi v. Scarf, 31 Mich. App. 240, 261, 187 N.W.2d 511, 521 (1971).
[5] "The right to have an abortion may not be automatically converted to an obligation to have one." Ziemba v. Sternberg, 45 A.D.2d 230, 233, 357 N.Y.S.2d 265, 269 (1974).
[6] "[T]he parents of an unplanned ... child may feel, and properly so, that whether they wanted the child or not is beside the point once the child is born and that they have an obligation to rear the child as best they can rather than subject him to rearing by unknown persons." Troppi v. Scarf, 31 Mich. App. 240, 259, 187 N.W.2d 511, 520 (1971).