No. 64,252

JOHN ARCHE AND NICOLE ARCHE, *Appellants*, v. UNITED STATES OF AMERICA, DEPARTMENT OF THE ARMY, *Appellee.*

(798 P.2d 477)

Opinion filed August 31, 1990.

*Lynn R. Johnson*, of Shamberg, Johnson, Bergman & Morris, Chartered, of Overland Park, argued the cause, and *John M. Parisi*, of the same firm, and *Walter P. Robertson*, of Walter P. Robertson, Chartered, of Junction City, were with him on the briefs for the appellants.

*Robert A. Olsen*, Assistant United States Attorney, of Kansas City, argued the cause, and *Benjamin L. Burgess, Jr.*, United States Attorney, of Wichita, was with him on the brief for the appellee.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, was on the brief for *amicus curiae* Kansas Medical Society.

*G. Gordon Atcheson*, of Blake & Uhlig, P.A., of Kansas City, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

MILLER, C.J.: This is a medical malpractice wrongful birth action brought in the United States District Court for the District of Kansas by John and Nicole Arche against the United States of America, Department of the Army. Chief Judge Earl E. O'Connor of the United States District Court has certified the following questions for resolution by this court pursuant to the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq.*:

1. Does Kansas law recognize a cause of action for the wrongful birth of a permanently handicapped child?

2. If Kansas does recognize such a cause of action, what is the extent of damages which may be recovered upon proper proof?

Chief Judge O'Connor rejected defendant's request that the issue of the appropriate standard of care be certified to this court. The facts of the case are thus irrelevant and will not be noted here. We limit our opinion to a determination of the two questions certified, neither of which has been resolved in our prior cases. We emphasize that in answering these questions we express no opinion as to whether plaintiffs should ultimately prevail in this action.

A discussion of three types of related malpractice torts is helpful in our analysis of the certified questions. These torts — wrongful pregnancy, wrongful life, and wrongful birth — have evolved because of advances in technology and the recognition of a woman's right to prevent conception or to terminate a pregnancy. See generally *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981); Comment, *"Wrongful Life": The Right Not to be Born,* 54 Tul. L. Rev. 480 (1980).

In the tort of *wrongful pregnancy,* parents who have taken medical steps to prevent pregnancy bring suit for damages caused by a child nevertheless being born, even if that child is born healthy. See *Bruggeman v. Schimke,* 239 Kan. 245, 248, 718 P.2d 635 (1986). The majority of states addressing the question, including Kansas, have recognized a cause of action for limited damages for wrongful pregnancy. See *Johnston v. Elkins,* 241 Kan. 407, 412, 736 P.2d 935 (1987), in which we recognized a cause of action for an unsuccessful vasectomy resulting in the conception and birth of a healthy child. However, we have consistently refused to allow damages beyond those suffered prior to and at the birth of the child. *Johnston,* 241 Kan. at 413. In refusing to allow damages for the costs of rearing a normal and healthy child in *Byrd v. Wesley Med. Center,* 237 Kan. 215, 699 P.2d 459 (1985), we noted:

"[W]e are not concerned here with an unsuccessful sterilization proceeding followed by the birth of a mentally retarded or physically handicapped child. Our concern here is only with items of damages claimed when it is alleged that a sterilization procedure was negligently performed, and thereafter, a normal, healthy child was born to the 'sterilized' parent."

The tort of *wrongful life* constitutes an action brought by an impaired child, whereby the child alleges that, but for the defendant's negligent advice or treatment, the child would not have

been born. The impairment is not caused by the defendant; the only negligence is in not determining or informing the parents of the defect before birth. *Bruggeman v. Schimke*, 239 Kan. at 248. We have refused to recognize a tort of wrongful life. *Bruggeman*, 239 Kan. at 254. The majority of states addressing the question have refused to recognize the cause of action. See *Bruggeman*, 239 Kan. at 249. There is no legal right not to be born, and allowing an action for being born would create a new tort, rather than applying established tort principles to technological advances.

The tort of *wrongful birth* differs from the tort of wrongful life in that the suit is brought by the parents, who claim they would have avoided conception or terminated the pregnancy had they been properly advised of the risks or existence of birth defects to the potential child. See *Bruggeman*, 239 Kan. at 248. See generally Annot., Tort Liability for Wrongfully Causing One to be Born, 83 A.L.R.3d 15. Whether a cause of action for wrongful birth will be recognized in the case of a child born with defects is a question of first impression in Kansas.

Twenty courts in other jurisdictions have recognized the action. State court opinions recognizing the action include: *Lininger v. Eisenbaum*, 764 P.2d 1202 (Colo. 1988); *Haymon v. Wilkerson*, 535 A.2d 880 (D.C. 1987); *Garrison by Garrison v. Medical Center of Delaware, Inc.*, 571 A.2d 786 (Del. 1989) (unpublished order of the court, text of order in Westlaw); *Fassoulas v. Ramey*, 450 So. 2d 822 (Fla. 1984); *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984) (superseded by Idaho Code §§ 5-310 and 5-311 [1990]); *Goldberg by and through Goldberg v. Ruskin*, 128 Ill. App. 3d 1029, 471 N.E.2d 530 (1984), *aff'd* 113 Ill. 2d 482, 499 N.E. 2d 406 (1986); *Pitre v. Opelousas General Hosp.*, 530 So. 2d 1151 (La. 1988); *Viccara v. Milunsky*, 406 Mass. 777, 551 N.E.2d 8 (1990); *Proffitt v. Bartolo*, 162 Mich. App. 35, 412 N.W.2d 232 (1987); *Smith v. Cote*, 128 N.H. 231, 515 A.2d 341 (1986); *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981); *Bani-Esraili v. Lerman*, 69 N.Y.2d 807, 513 N.Y.S.2d 382, 505 N.E.2d 947 (1987); *Speck v. Finegold*, 497 Pa. 77 (superseded by 42 Pa. Cons. Stat. Ann. § 8305 [Purdon 1990 Supp.]); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex. 1975); *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825 (1982); *Harbeson v. Parke-Davis, Inc.*,

98 Wash. 2d 460, 656 P.2d 483 (1983); *James G. v. Caserta*, ___ W. Va. ___, 332 S.E.2d 872 (1985); *Dumer v. St. Michael's Hospital*, 69 Wis. 2d 766, 233 N.W.2d 372 (1975). Federal court opinions recognizing the action include: *Phillips v. U.S.*, 575 F. Supp. 1309 (D.S.C. 1983) (applying South Carolina law); *Robak v. U.S.*, 658 F.2d 471 (7th Cir. 1981) (applying Alabama law).

Arizona, California, and Utah have sometimes been cited as states recognizing the action, but the issue has not been clearly presented and determined in those states. See *Walker by Pizano v. Mart*, 164 Ariz. 37, 790 P.2d 735 (1990); *Andalon v. Superior Court*, 162 Cal. App. 3d 600, 208 Cal. Rptr. 899 (1984); *Payne by and through Payne v. Myers*, 743 P.2d 186 (Utah 1987) (see Utah Code Ann. § 78-11-23 *et seq.* [1987]).

Defendants cite three decisions in which courts have refused to recognize wrongful birth actions: *Wilson v. Kuenzi*, 751 S.W.2d 741 (Mo.), *cert. denied* 109 S. Ct. 229 (1988); *Azzolino v. Dingfelder*, 315 N.C. 103, 337 S.E.2d 528 (1985), *cert. denied* 479 U.S. 835 (1986), *reh. denied* 319 N.C. 227, 353 S.E.2d 401 (1987); and *Spencer by and through Spencer v. Seikel*, 742 P.2d 1126 (Okla. 1987).

*Wilson*, 751 S.W.2d 741, has been recently distinguished by the Missouri Supreme Court in *Shelton v. St. Anthony's Medical Center*, 781 S.W.2d 48, 50 (Mo. 1989). In *Shelton* the court allowed a cause of action because the plaintiff did not merely state that she would have terminated the pregnancy (a claim barred by statute), but that she suffered emotional distress from the defendants' failure to properly interpret ultrasound tests and advise her that her fetus was not developing normally.

*Azzolino*, 315 N.C. 103, was distinguished in *Gallagher v. Duke University*, 852 F.2d 773, 776-78 (4th Cir. 1988), where the federal court, applying North Carolina law, allowed a cause of action to a woman who conceived and gave birth to a genetically impaired child after being incorrectly informed by defendants that her first child's impairments were not genetically caused. In *Gallagher*, the court distinguished the plaintiff's decision *to conceive* based on negligent advice from the plaintiff's claim in *Azzolino* that, *after conception*, she should have been advised of the availability of amniocentesis.

*Spencer,* 742 P.2d 1126, is distinguishable from other wrongful birth cases in that the physician in that case fully informed the mother that tests showed the fetus was suffering from hydrocephalus and fully informed the mother of the effects of that impairment. The mother's only claim was that the physician did not *inform* her of the option of abortion. None of the cited cases recognizing the action of wrongful birth rely on this omission; rather, the negligence is in not discovering the impairment.

We note that the Minnesota Supreme Court has upheld the constitutionality of a statute prohibiting wrongful birth claims. *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10 (Minn. 1986). A bill prohibiting wrongful birth or wrongful life actions was introduced in Kansas in 1983, but was not passed out of the Senate Judiciary Commitee. 1983 Senate Bill 258. Note *Damages: Recovery of Damages in Actions for Wrongful Birth, Wrongful Life and Wrongful Conception,* 23 Washburn L.J. 309 (1984).

*Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), was the first case in the United States to address the question of whether a cause of action for wrongful birth would be judicially recognized. The New Jersey Supreme Court refused to recognize such a cause of action, partly because of its finding that abortion violated public policy and partly because abortion was then illegal under state statute except to save the mother's life.

During the next twelve years, two major changes occurred: The ability to detect birth defects in utero greatly increased, and the United States Supreme Court recognized a woman's right to obtain an abortion. *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, *reh. denied* 410 U.S. 959 (1973).

These changes caused the New Jersey Supreme Court to reject its former reasoning and recognize a cause of action for wrongful birth in *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). The court held that *Roe v. Wade,* 410 U.S. 113, and *Doe v. Bolton,* 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973), had established that public policy now supported, rather than controverted, the proposition that a woman could not be denied a meaningful opportunity to make the decision to have an abortion. 80 N.J. at 431-32. In *Berman,* the defendant physicians did not inform the plaintiffs of available prenatal testing procedures which would have shown that Mrs. Berman was carrying a fetus with

Down's syndrome. The court disallowed a cause of action for wrongful life, but allowed the cause of action for wrongful birth, acknowledging that causation of damages might be found between the defendants' failure to inform and the denial of a woman's constitutional right to choose whether to terminate her pregnancy.

A plaintiff must prove three elements to prevail in a medical malpractice action in this state: "(1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injury sustained by the patient." *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988).

Under Kansas law, if it were determined "that the child would be born with physical or mental defect," Nicole Arche could have chosen to have an abortion. K.S.A. 21-3407. *Roe v. Wade*, 410 U.S. 113, recognizes the right of a woman to have an abortion. We assume that plaintiff Nicole Arche was denied her right to make an informed decision whether or not to seek an abortion under facts which could and should have been disclosed. Under all of these circumstances, we hold that the action of wrongful birth is recognized in Kansas.

In recognizing a cause of action for wrongful birth in this state, we assume that the child is severely and permanently handicapped. By handicapped, we mean, in this context, that the child has such gross deformities, not medically correctable, that the child will never be able to function as a normal human being. We further assume that there is negligence on the part of the defendants; that the gross defects of the child could have been determined by appropriate testing prior to birth; that defendants owed plaintiffs a duty to perform such tests; and that no such tests were offered or performed, or if performed, were negligently performed.

The remaining question to be answered is the extent of damages which are to be allowed. Formulas for damages in wrongful birth cases vary widely. See generally *University of Ariz. v. Superior Court*, 136 Ariz. 579, 667 P.2d 1294 (1983); Note, *Damages: Recovery of Damages in Actions for Wrongful Birth, Wrongful Life and Wrongful Conception*, 23 Washburn L.J. 309; Clinite, *Wrongful Birth: The Appropriate Measure of Damages*, 70 Ill. B.J. 772 (1982). The aim of a tort action is to restore the plaintiff

to the position he or she would have occupied had the injury not occurred. Restatement (Second) of Torts § 901, comment *a* (1979). However, in a wrongful birth case, the result of the tortious conduct is the existence, or benefit, of a child. Nevertheless, "[t]here is by now quite general agreement that the parents should be permitted to recover at least their pecuniary losses." Prosser and Keeton, Law of Torts § 55, p. 371 (5th ed. 1984).

In *Gleitman v. Cosgrove*, 49 N.J. 22, the New Jersey case which first refused to recognize a cause of action for wrongful birth, the court held that damages would be too difficult to measure because the court "would have to evaluate the denial . . . of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries." 49 N.J. at 29.

Twelve years later, however, in *Berman v. Allan*, 80 N.J. 421, the court held that "to deny redress for [the parents'] injuries merely because damages cannot be measured with precise exactitude would constitute a perversion of fundamental principles of justice." 80 N.J. at 433. The court allowed recovery for the parents' emotional distress but disallowed special damages out of a lingering concern that the parents would retain all the benefits of the child while forcing the defendants to bear all the financial burdens. In 1981, the court modified its holding in *Berman* by allowing recovery for extraordinary medical expenses. *Schroeder v. Perkel*, 87 N.J. 53.

Almost all cases allowing the action now allow those expenses caused by the child's handicaps. See, *e.g.*, *Robak v. United States*, 658 F.2d 471; *Lininger v. Eisenbaum*, 764 P.2d 1202; *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 691, 512 N.E.2d 691 (1987); *Procanik by Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984); *James G. v. Caserta*, ____ W. Va. ____, 332 S.E.2d 872. Some of these courts have limited damages to only these expenses. See, *e.g.*, *Fassoulas v. Ramey*, 450 So. 2d at 824; *Smith v. Cote*, 128 N.H. 231; *Schroeder v. Perkel*, 87 N.J. 53.

Wrongful birth plaintiffs typically desire a child and plan to support the child. Such support is, of course, the obligation of all parents. It is therefore reasonable to deny those normal and forseeable costs which accrue to all parents. See *Smith v. Cote*,

128 N.H. at 244; *Fassoulas v. Ramey*, 450 So. 2d at 824. We hold that those expenses caused by the child's handicaps may be recovered, but not those expenses natural to raising any child.

We next must consider whether plaintiffs in a wrongful birth suit may recover for emotional distress. Some courts have held that parents may recover for emotional distress suffered as the consequence of witnessing the birth of an impaired child and the consequent stress of raising such a child. See *Blake v. Cruz*, 108 Idaho 253; *Shelton v. St. Anthony's Medical Center*, 781 S.W.2d 48; *Berman v. Allan*, 80 N.J. 421; *Naccash v. Burger*, 223 Va. 406. See generally, Annot., Recoverability of Compensatory Damages for Mental Anguish or Emotional Distress for Tortiously Causing Another's Birth, 74 A.L.R.4th 798.

The rule in Kansas is that plaintiffs can sustain a cause of action for negligent infliction of emotional distress caused by the injuries of a third party only if they were witnesses to the occurrence which caused the injury. *Smelko v. Brinton*, 241 Kan. 763, 740 P.2d 591 (1987); *Schmeck v. City of Shawnee*, 231 Kan. 588, 647 P.2d 1263 (1982). We have thus far held that visibility of results as opposed to visibility of the tortious act does not give rise to a claim for emotional damages. The child's injury in this case occurred without human fault during development of the fetus; the parents were not aware of the injury at the time. The parents in *Schmeck* were responsible for their disabled child and suffered emotional distress because of the disablement, but were denied recovery for emotional distress. We see no reason why a wrongful birth case should be distinguished. We therefore hold that damages for emotional distress of the parents are not recoverable in a wrongful birth case.

We next determine whether the "benefit rule" should be applied to reduce the damages payable by the defendant. The benefit rule requires that any special benefits to the plaintiffs from having a child should be offset against the damages caused by the defendant's negligence. The rule has usually been applied against damages for emotional distress or damages for the general costs of raising a child. See Note, *Wrongful Birth: Who Owes What to Whom and Why?*, 40 Wash. & Lee L. Rev. 123, 137 (1983). The rule may be necessary where damages for emotional distress are allowed, to take into account those positive emotions

engendered by the child's existence, or where the normal costs of raising a child are allowed, to take into account the plaintiffs' benefit of parenthood. Having denied both items of damage, however, we find it unnecessary to allow reduction of the award by means of the benefit rule. The special costs of caring for a disabled child are not logically subject to any offset in themselves.

. In discussing the benefit rule in wrongful birth actions, the Colorado court in *Lininger v. Eisenbaum*, 764 P.2d 1206 (Colo. 1988), noted that two prior cases had discussed the issue: *Gallagher v. Duke University*, 852 F.2d 773, held the offset rule does not apply in wrongful birth cases; *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984), held the offset rule applies only to those claims for the parents' emotional distress. The *Lininger* court declined to decide whether damages for emotional distress could be recovered or whether the offset rule would apply to those damages, but found the rule did not apply as to actual damages, stating, "We think it clear that the extraordinary financial burden the Liningers claim to have suffered, and will continue to suffer, is sufficiently unrelated to the pleasure they will derive from raising [their disabled child] as to preclude operation of the benefit rule." 764 P.2d at 1207. We agree and find that the "benefit rule" should not be applied to wrongful birth cases in Kansas.

The final question to be determined, concerning allowable damages, is over what period of time such expenses may be recovered. Those courts presented with the issue of whether expenses may be compensated beyond the age of the child's majority have generally found that they may where the child will be incapable of self-support. See *Phillips v. U.S.*, 575 F. Supp. 1309, 1317 (D.S.C. 1983) (extraordinary expenses recoverable for impaired child's 40-year life expectancy); *Robak v. U.S.*, 503 F. Supp. 982 (N.D. Ill. 1980), *aff'd in part, rev'd in part* 658 F.2d 471 (7th Cir. 1981); *Lininger v. Eisenbaum*, 764 P.2d 1202; *Garrison by Garrison v. Medical Center of Delaware, Inc.*, 571 A.2d 786 (Del. 1989) (text of order in Westlaw); *Blake v. Cruz*, 108 Idaho 253 (statutory law applied; extraordinary costs allowed beyond the age of majority); *Smith v. Cote*, 128 N.H. 231, 245, 515 A.2d 341 (1986); *James G. v. Caserta*, ___ W. Va. ___, 332 S.E. 2d 872 (1985). Contra *Gallagher v. Duke University*, 852 F.2d 773,

778 (4th Cir. 1988); *Bani-Esraili v. Lerman,* 69 N.Y.2d 807, 513 N.Y.S.2d 382, 505 N.E.2d 947 (1987).

The court in *Garrison by Garrison v. Medical Center of Delaware, Inc.*, 571 A.2d 786, held that those expenses which exceed the usual and ordinary costs of raising, caring for, and educating an unimpaired child may be awarded over the impaired child's life or life expectancy to the extent the child remains dependent upon either or both parents. The court held the parents would stand in a fiduciary relationship with the child, with a duty to account for all sums recoverable by the parents as damages. The court in *Blake v. Cruz*, 108 Idaho 253, noted that the general rule is that the obligation of a parent to support a child ceases when the child reaches the age of majority. However, an exception occurs for the adult child who is physically and mentally incapacitated.

Legal scholars find it doubtful that there was a duty by parents to support their children under earliest common law in England and in this country. See Comment, *The Parental Duty to Support Disabled Adult Children,* De Paul L. Rev. 245, 245-47 (1960). Rather, the duty was believed to be only a moral one unless dictated by statute. See Annot., Parent's Obligation to Support Adult Child, 1 A.L.R.2d 910, 913. An early decision in this country recognized that this seemed unjust, but held the common law considered moral obligations of such nature better "left in their performance to the impulses of nature." 9 De Paul L. Rev. at 246 (citing *Kelley v. Davis*, 49 N.H. 187 [1870]).

By the twentieth century, however, the majority of American courts repudiated this view, and held that, regardless of statute, parents are under a legal as well as a moral duty to support their children. See cases cited in 9 De Paul L. Rev. at 247 n.8; Annot., Postmajority Disability as Reviving Parental Duty to Support Child, 48 A.L.R.4th 919; Annot., 1 A.L.R.2d 910; 59 Am. Jur. 2d, Parent and Child § 90. The obligation is now "sometimes spoken of as one under common law and sometimes as a matter of natural right and justice, and is often accepted as a matter of course without the assignment of any reason." 9 De Paul L. Rev. at 247.

Courts still varied at first, however, in their view of the extent to which this duty existed. Some courts held that, in the absence

of statute, the duty terminated when the child reached majority, even though the adult child was incapable of self-support through physical or mental handicap. See *Napa State Hospital v. Flaherty*, 134 Cal. 315, 66 Pac. 322 (1901); *Moss v. Moss*, 163 Wash. 444, 1 P.2d 916 (1931).

Other courts held the duty continued where the child remained incompetent, under the rationale that the adult child remained as helpless as an infant. The primary foundation for the imposition of a common-law duty of support is that children are incompetent to support themselves; where the foundation remains, the duty remains. See *Crain v. Mallone*, 130 Ky. 125, 113 S.W. 67 (1908); *Gaydos v. Domabyl*, 301 Pa. 523, 152 A. 549 (1930).

These jurisdictions finding a legal duty of support were split by various restrictions put on the continuing obligation by some of the courts. Some courts required that the adult child be incapacitated at the time of reaching majority. See *Crain*, 130 Ky. 125; Annot., 48 A.L.R.4th 919, 926 § 2[b]. Later, the Kentucky court required that the adult child have remained a member of the household. See *Breuer v. Dowden*, 207 Ky. 12, 15, 268 S.W. 541 (1925).

We have held that a parent has a common-law duty of support extending as long as the child is so incapacitated as to be unable to maintain and support himself or herself. See *In re Estate of Glass*, 175 Kan. 246, Syl. ¶ 1, 262 P.2d 934 (1953); *Prosser v. Prosser*, 159 Kan. 651, 157 P.2d 544 (1945); *Sheneman v. Manring*, 152 Kan. 780, 107 P.2d 741 (1940). All three cases relied upon Kansas statutes to support the finding that Kansas recognized a common-law duty of a parent to support an adult incompetent child.

In *Sheneman v. Manring*, 152 Kan. 780, an indigent adult daughter incapable of supporting herself because of health problems unspecified in the opinion obtained an order from the probate court, affirmed by the district court, for monthly support from the estate of her incompetent father. The estate was found to be ample for the needs of both.

The father's guardian appealed, arguing the daughter was no longer a member of her father's household. We accepted this exception as part of the old common law, but found that support was properly mandated by the broad equity powers granted the

probate court. We further found support for the probate court's decision in G.S. 1935, 39-233, a statute declaring that parents are liable for the support of their incompetent children. The opinion cites *State v. Bryan,* 105 Kan. 483, 185 Pac. 25 (1919), and quotes from *State v. Bateman,* 110 Kan. 546, 204 Pac. 682 (1922), that R.S. 1923 [G.S. 1935] 39-233 " 'is an innovation of the common-law liability of relatives, and recognizes the moral obligation resting upon the parent to provide for an adult insane child, and makes of that imperfect obligation a legal one.' " 152 Kan. at 782. The opinion in *Sheneman* also cites G.S. 1935, 59-1804 (1939 Supp.), which authorizes the guardian of an incompetent person to pay for the support of the incompetent's "children"— without limiting it to "minor children." We affirmed the district court's order, allowing the monthly payments for support of the incompetent adult child, where the incompetent parent's estate was shown to "readily afford" the contribution, under authority of the statutory and *equitable* powers vested in the probate court. 152 Kan. 780, Syl. ¶ 1.

Courts often relied on "poor laws" requiring contribution by parents, grandparents, or even more distant relatives to the support of indigent incompetent children or adults. See generally Comment, 9 De Paul L. Rev. at 246. The courts nevertheless often found means to enforce a common-law obligation of support where such poor laws were not in existence or were inapplicable.

Such was the case in *Prosser v. Prosser,* 159 Kan. 651, where the mother of an indigent, incompetent adult daughter brought an action against the daughter's father for contribution to the daughter's support. The daughter was mentally retarded, deaf, partially paralyzed, and almost totally blind. The father, divorced from the mother, had ceased contributions for his daughter's support when she reached 21, although he was financially able to continue support. The daughter lived with and was cared for by her mother, who was finding it impossible to meet all the expenses entailed by her care. The mother was nevertheless unwilling to admit the daughter to a state institution.

The father argued there was no statutory authority for requiring support. We noted, however, that the action was not brought under the authority of a statute, but .

"brought to enforce the common law duty of a parent to provide for the support and maintenance of his children. It is a generally accepted rule that where a child on becoming of age is in such a feeble and dependant condition, physically or mentally, as to be unable to support himself the parental obligations and duties toward such a child remain unchanged." 159 Kan. at 653.

We cited *Sheneman v. Manring*, 152 Kan. 780, and G.S. 1935, 39-233, in imposing liability upon parents for the support of their incompetent adult children. 159 Kan. at 653-54. We therefore upheld the district court's denial of the father's demurrer to the daughter's petition.

The final Kansas case we must consider is *In re Estate of Glass*, 175 Kan. 246. The issue there presented was "whether the claim of the state department of social welfare against a parent for the support of incompetent children committed to a state hospital survives the death of the parent and may be proved as a demand against the parent's estate." 175 Kan. at 247.

The decedent, Lucy Glass, was the mother of two adult incompetent children who were committed to the Osawatomie State Hospital. She left a will in which she left no bequests or devises to these two children. During the probate proceedings, the State filed a timely petition for allowance of its demand against the Glass estate for the maintenance, care, and treatment of the two adult incompetent children up to the date of Mrs. Glass's death. The executor objected, contending that the State's claim abated and did not survive decedent's death. Both the probate and district courts sustained this objection. This court held that the claim survived. We reversed the district court and remanded the cause for further proceedings.

We discussed our prior holdings in *Sheneman* and *Prosser*, and said:

"[A] parent has a common law duty to provide support and maintenance for his minor children and that such duty extends and remains unchanged to a child who, on becoming of age, is in such feeble and mental condition physically and mentally as to be unable to maintain and support itself." 175 Kan. at 250.

The executor argued that the demand was based wholly on G.S. 1949, 59-2006 (1951 Supp.), which provided in part:

"The following shall be bound by law to support persons committed to or received as patients at the state hospitals . . . . : Spouses, parents and children. . . . The state department of social welfare may recover the sum of twelve dollars ($12) per week as compensation for the maintenance, care and treatment of a patient in a state hospital . . . from any person bound by law to support such person . . . ."

We did not agree with the executor's argument and held that there is a nonstatutory (or common-law) duty, as well as a statutory duty, upon the parent to support an adult incompetent child.

The Kansas Legislature, in 1907, in an act "concerning lunatics, insane persons, idiots, imbeciles, distracted persons, feeble-minded persons, drug habitues, and habitual drunkards," provided:

"The following relatives shall be bound by law to provide for and support [persons admitted to state hospitals]: The husband for the wife and the wife for the husband, the parent for his or her children, and children for their parents." L. 1907, ch. 247, § 33.

That act, later codified as R.S. 1923, 39-233, was repealed in 1939 upon the complete revision of our probate code. See L. 1939, ch. 180, § 280. G.S. 1935, 59-2006 (1939 Supp.), however, (later codified, as amended, as K.S.A. 59-2006, [Corrick]) continued the liability of parents for the support of their incompetent children in the following language:

"The following shall be bound by law to support persons adjudged to be insane: Spouses, parents, and children. . . . The state may recover the sum of five dollars per week, to be applied on the maintenance, care and treatment of a patient in a state hospital, from . . . any person bound; by law to support such person."

The amount which the state could recover from persons bound by law to support patients was increased in 1965 to the sum of twelve dollars per week. L. 1965, ch. 349, § 1.

The following legislature reduced the list of persons whose duty it is to support patients in state hospitals. See L. 1967, ch. 474, § 1. Thereafter, only *spouses and parents of minor children* are bound by law to support patients in state hospitals. The current statute imposes such a duty only upon "[a] person's spouse and the parents of a person who is a minor." K.S.A. 1989 Supp. 59-2006(a). The basic rate of charge for patients in state hospitals is

fixed at least annually by the secretary of social and rehabilitation services, "as determined by application of generally acceptable hospital accounting principles," and is published in the Kansas Register. K.S.A. 1989 Supp. 59-2006b.

Thus, under the statute, parents of incompetent adult children are not bound by law to support such children if they are patients in state hospitals. On the other hand, if we apply our "common-law" rule as expressed in *Sheneman, Prosser,* and *Glass,* parents are bound by law to support their incompetent adult children if the children are cared for at home, are patients in private institutions, or are anywhere except in state institutions. Such a ruling would create an inconsistency in our law and an incongruous situation.

It is a matter of common knowledge that the cost of medical and psychiatric care and treatment has risen to astronomical heights since the legislature fixed the amounts recoverable for patient care in state hospitals at five or even twelve dollars a week. For that reason, most people carry hospital and medical insurance. Even the most liberal coverage, however, is sometimes insufficient to cover catastrophic illnesses. Children are sometimes covered under their parents' hospital and medical plans past minority and through their normal college years; beyond that, children may not be insured under their parents' health insurance policies, but must have their own insurance.

Considering the realities of present-day insurance practices and hospital, medical, and surgical costs, should a parent be responsible for those expenses for his or her adult child? Consider a parent of middle age and average circumstances whose adult child suddenly becomes incompetent. Should the parent, under the "common law" of Kansas, be legally responsible for the care and treatment of that adult child?

Consider also parents, such as the plaintiffs in this action, who have the misfortune to give birth to a child who suffers gross deformities and has no hope of ever becoming a normal, self-supporting adult. Should the parents of that child be legally responsible for the continuing support and maintenance of that child after it reaches majority? Or should the State assume that responsibility, once the child becomes an adult? The Kansas Legislature has faced that precise issue and has determined that

parents should no longer be responsible once an incompetent child, a patient in a state hospital, reaches majority.

K.S.A. 77-109 provides as follows:

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state . . . ."

As we have seen, under the earliest common law a parent was not responsible for the care of an adult incompetent child. That common-law rule was modified by our earlier decisions and by statutory law. Then, in 1967, the legislature reinstated the early common-law rule that a parent would not be liable for the support, care, and maintenance of an adult incompetent child who was in a state hospital. After careful study, and in light of the economic realities of our present society, we conclude that we should follow the lead of the Kansas Legislature and modify our decisional law. Accordingly, we hold that a parent is no longer required by law to provide support for an adult incompetent child in this state. Recovery in this case, then, may be had only for the period of time of the child's life expectancy or until the child reaches the age of majority, whichever is the shorter period.

Finally, we must voice a concern that has not been briefed by the parties and is outside the scope of the questions certified to us. This concern is the possible unjust use of any damage award received by parents in a wrongful birth case.

We note that the plaintiffs in *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978), are reported to have put their handicapped child up for adoption after the denial of their wrongful life action but during the course of a separate wrongful birth action. See Comment, *Wrongful Life: A Misconceived Tort—An Introduction*, 15 U.C.D. L. Rev. 445, 470 n.136 (1981).

Damages are to be based on those extra expenses caused by the child's disabilities. It would be unjust for the parents to be able to recover such damages and escape the expenses.

These concerns, and many others, could be avoided through the use of a reversionary trust. In *Robak v. United States*, 503 F. Supp. 982 (N.D. Ill. 1980), *aff'd in part, rev'd in part* 658 F.2d 471 (7th Cir. 1981), the United States District Court for

Northern Illinois suggested the establishment of a reversionary trust as the mechanism for the payment of an award for wrongful birth damages. 503 F. Supp. at 983. See Note, *Robak v. United States: A Precedent-Setting Damage Formula for Wrongful Birth,* 58 Chi. Kent L. Rev. 725 (1982). Both parties agreed money would be placed in trust and money disbursed as needed to pay for the costs of the child's care. Upon the child's death, the remainder, if any, would be returned to the defendant. We note, of course, that the trust was created by agreement of the parties.

In *Robak,* the court based the award on the life expectancy of a healthy child, confident that the parents would not thereby receive a windfall because of the use of the reversionary trust. In some instances, this would be a reasonable calculation. In other circumstances, an award based on a normal lifespan would be contrary to medical knowledge. In *Curlender v. Bio-Science Laboratories,* 106 Cal. App. 3d 811, 165 Cal. Rptr. 477 (1980), the court allowed a wrongful life action for a child born with Tay Sachs disease. The court refused to use the actuarial life expectancy of 70 years of a normal child because the evidence clearly showed that children afflicted with Tay Sachs cannot be expected to survive longer than five years. Such matters are properly left to the sound discretion of the trial courts.

In summary: In response to Question No. 1, we hold that the tort of wrongful birth is recognized in Kansas. In response to Question No. 2, we hold that damages may be recovered for those costs which would not be incurred but for the child's disability. These costs may be calculated on the basis of the child's specific life expectancy or until the child reaches the age of majority, whichever is the shorter period.

SIX, J., concurring: I concur in the majority opinion. The majority, however, does not go far enough in its effort to protect any damage award from possible unjust use. The majority reasons that the use of the funds is "outside the scope of the questions certified to us." I disagree. We should judicially craft this new claim so that its characteristics require: (1) any sums recovered as damages by the parents for wrongful birth to be placed in a reversionary trust for the use and benefit of the child; and (2)

the parents to stand in a fiduciary relationship with the child, with a duty to account for all sums recoverable as damages.

We should mandate the two conditions into the claim for wrongful birth. If we have the authority to recognize the claim, we have the authority to determine its character. The trial court's discretion may be relied upon for establishing the mechanics of the reversionary trust-fiduciary relationship concept on an individual case basis.

The majority cites *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1985). In *Cruz,* a wrongful birth case, the Idaho Supreme Court, without parental consent, imposed the requirement that the economic award be placed in trust for the use and benefit of the child. 108 Idaho at 259.

The majority also discusses *Robak v. United States,* 503 F. Supp. 982 (N.D. Ill. 1980), *aff'd in part, rev'd in part* 658 F.2d 471 (7th Cir. 1981). In *Robak,* the trial court decided that the monetary award ($900,000 total, $450,000 to each parent) for future maintenance and support of the child should not be paid in one lump sum. The award was placed in a reversionary trust with disbursements to be made as expenses were incurred. See Note, *Robak v. United States: A Precedent-Setting Damage Formula For Wrongful Birth,* 58 Chi. Kent L. Rev. 725 (1982), for an endorsement of the reversionary trust solution to the wrongful birth damage dilemma.

We have determined that the loss period for the recovery of damages terminates at the time the child reaches majority. The "loss period" represents the time frame for the determination of parent compensation for the wrongful birth condition of the child which has resulted, or will result, due to the negligence of the defendant.

A review of the pretrial order in the instant action reflects the atypical relationship between the plaintiff parents' claim and the child whose condition provides the basis of the claim. The $10,000,000 claim of special damages of John and Nicole Arche (parents) for the care of their daughter Andrea born April 6, 1987, is stated as:

| | |
|---|---|
| Loss of earning capacity (loss of income and benefits) | $1,000,000.00 |
| Medical supplies | 400,000.00 |

| | |
|---|---:|
| Physical therapy, occupation therapy, speech therapy, and miscellaneous therapy | 1,750,000.00 |
| Attendant care and therapy | 2,300,000.00 |
| Mother care | 300,000.00 |
| Rehabilitation services and care | 1,000,000.00 |
| Special education services | 1,500,000.00 |
| Medical care | 750,000.00 |
| Home remodeling and furnishings | 250,000.00 |
| Orthotic and miscellaneous supplies | 250,000.00 |
| Communication equipment and training | 500,000.00 |

As I read *Robak,* the trial court suggested the reversionary trust. 503 F. Supp. at 983. The parents agreed that the award would be placed in trust and funds from the corpus paid as required for the child's care. Upon the death of the child the remainder of the funds would be returned to the defendant. There may be cases where the wrongful birth child will not live to reach majority.

The reversionary trust concept addresses three concerns that merit our consideration. It assures *first,* that the child will be adequately cared for; *second,* that the parents will be properly compensated for the additional wrongful birth expenses during the "loss period"; and *third,* if the child does not survive the "loss period," that the parents are not compensated for expenses they never incurred. In *Robak,* as in the instant case, the defendant is the United States. Any judgment will be paid by the nation at large. In many other cases the defendant may be an individual health care provider.

We have denied a claim brought by a child for wrongful life. *Bruggeman v. Schimke,* 239 Kan. 245, 254, 718 P.2d 635 (1986). A wrongful life child in this jurisdiction cannot be reimbursed for future medical expenses that will be incurred as a result of a defendant's negligence. The child may not recover for damage to his or her own interest. If the parents do not recover for the child's future needs in the wrongful birth claim, no one will.

The juxtaposition between the substantive law of wrongful birth, as a new tort, and the damage award for that tort is unique. The claim is by the parents, for the parents, based on the special needs of the child. The typical case involving a claim for future expense arising from personal injuries to a minor is controlled by *Stone v. City of Pleasanton,* 115 Kan. 476, 222 Pac. 303 (1924).

A parent cannot recover for the minor child's prospective medical care. The claim belongs to the minor.

The anomalous relationship between a plaintiff and an award in a wrongful birth case brings the use of any funds recovered within our province. We determine the substantive case law of torts in Kansas. If we are to recognize the new tort of wrongful birth, as I feel we should, we can define its characteristics.

MCFARLAND, J., joins the foregoing concurring opinion.