Robert **LIDDINGTON** and Shirley Liddington, individually, and as parents and next friends of Holly Nicole Liddington, a minor, Plaintiffs,

v.

Larry A. **BURNS**, D.O., Larry A. Burns, D.O., Inc., James E. Short, M.D. and James E. Short, M.D., Inc., Defendants.

No. CIV-95-0005-M.

United States District Court, W.D. Oklahoma.

Oct. 31, 1995.

Order Denying Reconsideration and Clarifying Decision Jan. 26, 1996.

David L. Thomas, Glendell D. Nix, Oklahoma City, Oklahoma, for plaintiffs.

John Wiggins, Randall Sewell, Oklahoma City, Oklahoma, for defendants.

### ORDER DENYING MOTION FOR SUMMARY JUDGMENT

MILES–LaGRANGE, District Judge.

Before the Court is the motion for summary judgment filed September 1, 1995 by defendants James E. Short, M.D. and James E. Short, M.D., Inc. (collectively, "Dr. Short"). Plaintiffs responded October 2, 1995. Based upon the parties' submissions, the Court makes its determination.

### INTRODUCTION

This is a medical negligence case arising from the birth of Holly Nicole Liddington with severe cerebral and neurological deformities. Shirley Liddington ("Mrs. Liddington") and Robert Liddington ("Mr. Liddington") are Holly's parents.

Early in the first trimester of her pregnancy, Mrs. Liddington (then Shirley Chambers) decided to have an abortion and selected Dr. Larry A. Burns to perform it. He made his first attempt on January 5, 1993. It was unsuccessful. He made his second attempt on January 9, 1993. It also was unsuccessful. Mrs. Liddington decided to see a different doctor and on January 12, 1993, she saw Dr. Short to complete the abortion. She told Dr. Short of Dr. Burns' two failed abortion attempts. Dr. Short performed an ultrasound and told her the fetus was "probably" normal. She decided to continue her pregnancy. Dr. Short treated her from January 12 to mid-May 1993, but never performed another ultrasound on her. In mid-May, Mr. and Mrs. Liddington moved to Phoenix, Arizona to be near his parents. Mrs. Liddington's Phoenix physician performed an ultrasound and informed her the fetus was severely deformed. By then she was in her third trimester (28 weeks) and her physician informed her that she could not legally obtain an abortion. Holly was born August 17, 1993, with severe cerebral and neurological deformities. The cost of her care is approximately $300,000.00 per year.

Mr. and Mrs. Liddington allege Dr. Short was negligent in advising Mrs. Liddington that there was probably nothing wrong with the fetus and in encouraging her to carry her pregnancy to term. They further allege Dr.

Short was negligent in failing to order repeat ultrasound tests on a regular basis following his initial examination on January 12, 1993, because those tests would have revealed the fetus' gross central nervous system abnormalities at a time when it would have been legally permissible for Mrs. Liddington to terminate her pregnancy.

### DISCUSSION

Initially, Dr. Short contends that he has no liability because Oklahoma would not allow the Liddington's to recover damages proximately caused by his alleged negligence under the circumstances of this case. In other words, Dr. Short contends Oklahoma would not recognize this type of medical negligence action (which, as explained below, is often labeled a wrongful birth action).

At the outset, the Court emphasizes that the question at this point is not who should ultimately prevail. The jury will decide that. The question is whether Oklahoma would recognize a wrongful birth claim.

██ Also at the outset, the Court emphasizes this case is not about whether abortion is right or wrong. The Supreme Court has already established a constitutional right of parents to decide whether to prevent the conception or birth of a child. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (reaffirming constitutional right of a woman to chose an abortion before fetal viability). Consequently, it is undisputed that during the time Mrs. Liddington was being treated by Dr. Short, she had the right to

have an abortion and the right to seek medical advice that might lead to her decision to have an abortion. The existence of this right and of the correlative duty of health care providers not to deprive her of an opportunity to make an informed decision are well established. *Haymon v. Wilkerson,* 535 A.2d 880 (D.C.App.1987).

### *Wrongful pregnancy, wrongful birth and wrongful life actions*

██ There are three categories of cases in this area of medical negligence litigation. They are labeled wrongful pregnancy, wrongful birth and wrongful life actions. *See, e.g., Keel v. Banach,* 624 So.2d 1022 (Ala.1993). In a "wrongful pregnancy" action, a parent claims that the physician's negligence in the provision of contraceptives, in the performance of a sterilization procedure or in the performance of an abortion procedure, led to the birth of a healthy and normal, but unplanned child. In a "wrongful birth" action, a parent claims the physician's negligence caused the birth of an unhealthy, abnormal child. And in a "wrongful life" action, an unhealthy, abnormal infant sues on its own behalf (or through its parent(s)).[1]

Using the labels identified above, this is a wrongful birth action.[2] However, the labels are not instructive because it is not the pregnancy, birth or life that is wrongful. As stated by the Maryland court:

Any "wrongfulness" lies not in the life, the birth, the conception or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself but the effect of the defendant's negligence on the [parents] resulting from the denial to

---

1. Courts have also begun to recognize the tort of "wrongful adoption" which involves the denial to the opportunity to make an informed decision to adopt a child. *See* Robert J. Baker, *Gibbs v. Ernst: Pennsylvania Recognizes Negligent Disclosure in Wrongful Adoption Cases,* 31 Tort & Ins. L.J. 103 (Fall 1995) (discussing *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994)).

2. It was not clear from plaintiffs' complaint whether the parents were asserting only their wrongful birth claim or were, instead, asserting both their wrongful birth claim and their child's wrongful life claim. However, in their briefs in response to defendants' motions for summary judgment, the parents have made it clear they

are asserting only their wrongful birth claim. *See* Plaintiffs' Brief in Response to Defendant Burns' Motion for Summary Judgment at 7 (Sept. 27, 1995) ("In the present case, plaintiffs seek damages for the wrongful *birth* of their daughter, Holly, with catastrophic neurological birth defects.") (emphasis in original); Plaintiffs' Brief in Response to Defendant Short's Motion for Summary Judgment at 5 (Oct. 2, 1995) ("Plaintiffs hereby adopt their arguments presented under Proposition I of their Brief in Response to Defendant Burns' Motion for Summary Judgment."). Accordingly, Holly Liddington's potential wrongful life claim is not part of this lawsuit.

the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect.

*Reed v. Campagnolo,* 332 Md. 226, 630 A.2d 1145, 1150 (1993) (quoting *Viccaro v. Milunsky,* 406 Mass. 777, 551 N.E.2d 8, 10 n. 3 (1990)).

Moreover, the so-called wrongful pregnancy, wrongful birth and wrongful life actions are not "new" torts. They fall within the traditional boundaries of negligence actions. *Keel,* 624 So.2d at 1026; *Arche v. United States of America, Dept. of the Army,* 247 Kan. 276, 798 P.2d 477 (1990); *Robak v. United States,* 658 F.2d 471 (7th Cir.1981).

Nevertheless, because the literature and the decisions from other jurisdictions use the labels, this Court will use them too.

### The Erie doctrine

██ A federal court sitting in diversity must apply the law of the forum state, in this case Oklahoma, and thus must ascertain and apply Oklahoma law with the objective that the result obtained in the federal court should be the result that would be reached in an Oklahoma court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Wood v. Eli Lilly & Co.,* 38 F.3d 510, 512 (10th Cir.1994). If the federal court cannot ascertain the law of the forum state, it must in essence sit as a state court and predict how the highest state court would rule. *Carl v. City of Overland Park, Kansas,* 65 F.3d 866 (10th Cir.1995). This is accomplished by considering related decisions from the forum state, the "majority rule", decisions from other jurisdictions whose doctrinal approach is substantially the same, treatises, law review articles, and other legal resources. *See* 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4507 at 100–03 (1982).

Since Oklahoma has not yet addressed wrongful birth actions, this Court must reach the decision it believes the Oklahoma Supreme Court would reach.

### Guidance from Oklahoma Supreme Court decisions

██ Two decisions of the Oklahoma Supreme Court suggest that Oklahoma would recognize wrongful birth actions. First, in recognizing wrongful pregnancy actions, the Oklahoma Supreme Court held that "[w]here the exercise of [a constitutional right to refrain from procreation] is interfered with as a result of the negligent performance of a physician in an attempted sterilization procedure, it is clear that a cause of action exists to recover for the detriment resulting from such negligence." *Morris v. Sanchez,* 746 P.2d 184, 185–86 (Okla.1987). There seems little doubt the Oklahoma Supreme Court would reach the same conclusion where the same constitutional right is at stake and the only difference is the form of the physician's negligence.

Second, in *Graham v. Keuchel,* 847 P.2d 342 (Okla.1993), the Oklahoma Supreme Court reversed a judgment in favor of a physician in a medical negligence case where the alleged negligence was the failure to type the mother's blood and administer the hyperimmune globulin Rho–GAM during an earlier miscarriage, which proximately caused the death of her infant son four days after his birth. While *Graham* was a wrongful death action, not a wrongful birth action, the legal analysis of the medical negligence claim is the same. The only difference between *Graham* and a wrongful birth action is whether the baby dies (wrongful death) or lives with severe abnormalities (wrongful birth).

### The "majority rule"

Virtually every court that has addressed the wrongful birth cause of action has recognized it. *Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (applying Alabama law); *Keel v. Banach,* 624 So.2d 1022 (Ala.1993); *Lininger v. Eisenbaum,* 764 P.2d 1202 (Colo. 1988); *Garrison v. Medical Ctr. of Del., Inc.,* 581 A.2d 288 (Del.1989); *Haymon v. Wilkerson,* 535 A.2d 880 (D.C.1987); *Fassoulas v. Ramey,* 450 So.2d 822 (Fla.1984); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984); *Goldberg v. Ruskin,* 113 Ill.2d 482, 101 Ill. Dec. 818, 499 N.E.2d 406 (1986); *Arche v. United States of America, Dept. of the Army,*

247 Kan. 276, 798 P.2d 477 (1990); *Pitre v. Opelousas General Hosp.*, 530 So.2d 1151 (La.1988); *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993); *Viccaro v. Milunsky*, 406 Mass. 777, 551 N.E.2d 8 (1990); *Proffitt v. Bartolo*, 162 Mich.App. 35, 412 N.W.2d 232 (1987); *Smith v. Cote*, 128 N.H. 231, 513 A.2d 341 (1986); *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981); *Bani–Esraili v. Lerman*, 69 N.Y.2d 807, 513 N.Y.S.2d 382, 505 N.E.2d 947 (1987); *Flanagan v. Williams*, 87 Ohio App.3d 768, 623 N.E.2d 185 (1993); *Speck v. Finegold*, 497 Pa. 77, 439 A.2d 110 (1981); *Phillips v. United States*, 508 F.Supp. 544 (D.S.C.1981) (applying South Carolina law); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825 (1982); *Harbeson v. Parke–Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983); *James G. v. Caserta*, 175 W.Va. 406, 332 S.E.2d 872 (1985); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975).

Two other state courts seem to have recognized the cause of action but have not addressed the issue directly. *See Walker v. Mart*, 164 Ariz. 37, 790 P.2d 735 (1990); *Andalon v. Superior Court*, 162 Cal.App.3d 600, 208 Cal.Rptr. 899 (1984).

Only three states have refused to recognize the wrongful birth cause of action. *See Atlanta Obstetrics & Gynecology Group v. Abelson*, 260 Ga. 711, 398 S.E.2d 557 (1990); *Wilson v. Kuenzi*, 751 S.W.2d 741 (Mo.1988); *Azzolino v. Dingfelder*, 315 N.C. 103, 337 S.E.2d 528 (1985). All three states rejected the tort for the same reason. They found no causation. They said that since the physician's alleged negligence did not "cause" the child's deformities, the physician could not be liable for such damages. *See, e.g., Azzolino*, 337 S.E.2d at 536 (The "physician cannot be said to have caused the defect. This disorder is genetic and not the result of any injury negligently inflicted by the doctor.").

However, as the Alabama Supreme Court explained:

> The nature of the tort of wrongful birth has nothing to do with whether a defendant caused the injury or harm to the child, but, rather, with whether the defendant's negligence was the proximate cause

of the parents being deprived of the option of avoiding a conception or, in the case of pregnancy, making an informed and meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child. Like most of the other courts that have considered this cause of action, we hold that the parents of a genetically or congenitally defective child may maintain an action for its wrongful birth if the birth was the result of the negligent failure of the attending physician to discover and inform them of the existence of fetal defects.

*Keel*, 624 So.2d at 1029.

### The rule in states looked to by Oklahoma

When Oklahoma recognized wrongful pregnancy actions in *Morris v. Sanchez*, 746 P.2d 184 (Okla.1987), it adopted the view expressed by the Supreme Court of Kansas in *Byrd v. Wesley Medical Center*, 237 Kan. 215, 699 P.2d 459 (1985), and by the New York Supreme Court, Appellate Division, in *Weintraub v. Brown*, 98 A.D.2d 339, 470 N.Y.S.2d 634 (1983).

Both Kansas and New York also recognize wrongful birth actions. *See Arche v. United States of America, Dept. of the Army*, 247 Kan. 276, 798 P.2d 477 (1990); *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978).

### Treatises and law review articles

In Prosser & Keeton on the Law of Torts, the authors succinctly state the background and context of this theory of liability as follows:

> The last couple of decades have witnessed the rapid development of tort claims concerning a variety of issues that arise when the tortfeasor's act or omission results in the birth of an unwanted child. The defendants in these cases are typically doctors charged with negligence in failing directly to prevent the conception or birth of the child, as by negligently performing a sterilization or abortion procedure, or in failing to diagnose or inform the parents that the child might be born deformed— because of a disease contracted by the

mother or a genetic condition in one of the parents—in time to permit the termination of the pregnancy. These actions are now generally referred to as "wrongful birth" claims, when brought by the parents for their own damages, and "wrongful life" claims, when brought by or on behalf of the child for the harm of being born deformed.

W. Page Keeton *et al., Prosser & Keeton on the Law of Torts* § 55, at 370 (5th ed. 1984).

Also, a number of law review articles discuss the recognition of wrongful birth actions. *See, e.g.,* Julie F. Kowitz, Note, *Not Your Garden Variety Tort Reform: Statutes Barring Claims for Wrongful Life and Wrongful Birth Are Unconstitutional Under the Purpose Prong of Planned Parenthood v. Casey,* 61 Brook.L.Rev. 235 (1995); Anthony Jackson, *Action for Wrongful Life, Wrongful Pregnancy, and Wrongful Birth In the United States and England,* 17 Loy.L.A. Int'l & Comp.L.J. 535 (1995); Shelly A. Ryan, *Wrongful Birth: False Representations of Women's Reproductive Lives,* 78 Minn. L.Rev. 857 (1994); Belinda L. Kimble, *Wrongful Birth: A Practitioner's Guide to a New Arrival,* 55 Ala.L.Rev. 84 (1994); Note, *Wrongful Birth Actions: The Case Against Legislative Curtailment,* 100 Harv.L.Rev. 2017 (1987); Peter A. Bell, *Legislative Intrusions into the Common Law of Medical Malpractice: Thoughts About the Deterrent Effect of Tort Liability,* 35 Syracuse L.Rev. 939 (1984).

### Oklahoma would recognize wrongful birth actions

Based upon the Oklahoma Supreme Court's guidance in *Morris* and *Graham,* the overwhelming majority view, the view of states that Oklahoma followed in recognizing wrongful pregnancy actions, and treatises and law review articles on the subject of wrongful birth actions, this Court concludes Oklahoma would, if presented the question, recognize wrongful birth actions.

### Recoverable damages

■ Neither party briefed the issue of what elements of damages are recoverable in a wrongful birth action. Certainly the extraordinary medical expenses and other pecuniary losses proximately caused by the negligence are recoverable. *Arche v. U.S. Dept. of the Army,* 247 Kan. 276, 798 P.2d 477 (1990). Just as certainly, the normal and foreseeable costs of raising a normal, healthy child are not recoverable. *Morris v. Sanchez,* 746 P.2d 184 (Okla.1987).

By a separate order entered this date, the Court is directing the parties to brief other possible elements of damages.

### Dr. Short's other grounds for summary judgment

Dr. Short also seeks judgment as a matter of law on the following grounds: (a) he was not negligent, (b) even if he were negligent, liability is precluded by 63 O.S. § 1–741(B), and (c) even if he were negligent, liability is precluded by Mrs. Liddington's failure to obtain a third trimester abortion after her Phoenix physician informed her of the fetus' severe abnormalities.

The Court will address each of these arguments in turn.

### Negligence

■ Dr. Short submitted his own affidavit as evidence that he was not negligent. However, the Court finds plaintiffs have met their burden of establishing the existence of a genuine issue of material fact as to Dr. Short's negligence. Thus, summary judgment is not appropriate on this ground.

### 63 O.S. § 1–741(B)

■ Next, Dr. Short seeks judgment as a matter of law on the ground that 63 O.S. § 1–741(B) absolutely precludes liability. Section § 1–741 provides:

§ 1–741. Abortions—Refusal to perform or participate—Exemptions

A. No private hospital, hospital director or governing board of a private hospital in Oklahoma, is required to permit abortions to be performed or induced in such hospital. Refusal to permit an abortion, in accordance with a standard policy, is not grounds for civil liability nor a basis for disciplinary or other recriminatory action.

B. No person may be required to perform, induce or participate in medical procedures which result in an abortion which are in preparation for an abortion or which involve aftercare of an abortion patient, except when the aftercare involves emergency medical procedures which are necessary to protect the life of the patient, and refusal to perform or participate in such medical procedures is not grounds for any civil liability nor a basis for disciplinary or other recriminatory action.

C. The rights and immunities granted by this section shall not include medical procedures in which a woman is in the process of the spontaneous, inevitable abortion of an unborn child, the death of an unborn child is imminent, and the procedures are necessary to prevent the death of the mother.

63 O.S. § 1–741.

Section 1–741(B) precludes civil liability for failure to perform "medical procedures which result in an abortion." Dr. Short argues this language precludes liability against him for any negligence in failing to perform ultrasounds. As the Court understands his reasoning, it is as follows:

(1) If he had performed ultrasounds he would have detected fetal abnormalities.

(2) If he had detected fetal abnormalities Mrs. Liddington would have elected to have an abortion.

(3) Thus, his performing ultrasounds would have resulted in an abortion.

The Court disagrees with that analysis. Applying well settled rules of statutory construction, the Court finds as a matter of law that for purposes of section 1–741(B), ultrasounds are not "medical procedures which result in an abortion."

### Third trimester abortion

▆ Finally, Dr. Short argues that any negligence on his part was superseded by Mrs. Liddington's failure to obtain a third trimester abortion after her Phoenix physician detected the fetal abnormalities. However, the undisputed evidence is that Mrs. Liddington's Phoenix physicians (as well as the Bioethics Committee of the Phoenix hospital) informed her that she could not legally have an abortion.

The Court finds as a matter of law that Mrs. Liddington's failure to obtain a third trimester abortion does not relieve Dr. Short of liability for his medical negligence, if any.

### CONCLUSION

Oklahoma would recognize wrongful birth actions. There is a genuine issue of material fact as to whether Dr. Short was negligent. For purposes of 63 O.S. § 1–741, ultrasounds are not "medical procedures which result in an abortion." And Mrs. Liddington's failure to obtain a third trimester abortion after her Phoenix physician informed her of the fetus' severe abnormalities does not preclude liability, if any, on the part of Dr. Short.

Dr. Short's motion for summary judgment (Doc. # 21) is DENIED.

**IT IS SO ORDERED.**

### ORDER DENYING DEFENDANTS' MOTION TO RECONSIDER

On October 31, 1995, the Court entered an order denying the motion for summary judgment filed by defendants, James E. Short, M.D. and James E. Short, M.D., Inc. (collectively, "Dr. Short"). The following day, November 1, 1995, Dr. Short filed a motion to reconsider and/or clarify that order. Plaintiffs filed a brief in response to the motion and Dr. Short filed a reply brief.

### DISCUSSION

Dr. Short takes issue with three parts of the October 31, 1995 order. In Dr. Short's view,

a. the Court "misconstrued" his argument concerning the application of 63 O.S. § 1–741(B);

b. the Court erred in finding as a matter of law that Mrs. Liddington's failure to obtain a third trimester abortion does not relieve Dr. Short of liability; and

c. the Court "inappropriately determine[d] what Oklahoma would do with respect to" recognizing a wrongful *life* cause of action.

The Court will address each of these items in turn.

### 63 O.S. § 1–741(B)

■ First, Dr. Short contends the Court misconstrued his argument concerning the application of 63 O.S. § 1–741(B). In its October 31, 1995 order, the Court understood Dr. Short's argument to be that he was protected from civil liability for failure to perform ultrasounds by section 1–741(B), since section 1–741(B) precludes liability for "medical procedures which result in an abortion." The Court derived its understanding of Dr. Short's argument from his brief in support of his motion for summary judgment. In that brief, Dr. Short argued as follows (reproduced in full):

### PROPOSITION II

### OKLAHOMA LAW PROTECTS A PHYSICIAN FROM PARTICIPATING IN MEDICAL PROCEDURES **WHICH WOULD RESULT IN AN ABORTION**

Title 63 O.S. § 1–741(B) states:

No person may be required to perform, induce, or participate in medical procedures **which result in an abortion** [emphasis in original], which are in preparation for an abortion, or which involve aftercare of an abortion patient, except when the aftercare involves emergency medical procedures which are necessary to protect the life of the patient, and refusal to perform or participate in such medical procedures is not grounds for civil liability nor a basis for disciplinary or other recriminatory action.

Plaintiffs are not contending that any of the care rendered by Dr. Short directly caused Holly Liddington's birth injuries. Rather, plaintiffs are contending Dr. Short should have diagnosed the fetal abnormalities through the use of repeat ultrasounds sometime during his obstetrical care of Shirley Liddington and at a time "when it would have still been legally and ethically permissible for Shirley Liddington to terminate her pregnancy." (See pages 7 and 8 of plaintiff's Complaint.) Any such "medical procedures" which plaintiffs contend Dr. Short should have performed would have been for the purpose of detecting a fetal anomaly and **a resulting abortion.**

While Dr. Short maintains that none of these tests or procedures were required (see Exhibit "A"), plaintiffs' assertions that ultrasounds should have been performed to detect fetal anomalies violates the protection of 63 O.S. § 1–741 that "no person may be required to perform, induce or participate in medical procedures **which result in an abortion...**.." Therefore, 63 O.S. § 1–741(B) precludes Dr. Short from civil liability for his failure to perform ultrasounds which forms the basis of plaintiffs' allegations of negligence against Dr. Short.

*See* Brief in Support of Motion for Summary Judgment of Defendants, James E. Short, M.D., and James E. Short, M.D., Inc. at 6–7 (Sep. 1, 1995).

Dr. Short used the phrase "result in an abortion" three times and "resulting abortion" once. He used "result in an abortion" in the title of his proposition. He highlighted the phrase "result in an abortion" when he quoted section 1–741(B) in full. He quoted the phrase "result in an abortion" again when he emphasized the specific part of section 1–741(B) on which he was relying.

There is no doubt what Dr. Short's position was at the time he filed his motion for summary judgment. And the Court rejected his position. The Court said:

Section 1–741(B) precludes civil liability for failure to perform "medical procedures which result in an abortion." Dr. Short argues this language precludes liability against him for any negligence in failing to perform ultrasounds. As the Court understands his reasoning, it is as follows:

(1) If he had performed ultrasounds he would have detected fetal abnormalities.

(2) If he had detected fetal abnormalities Mrs. Liddington would have elected to have an abortion.

(3) Thus, his performing ultrasounds would have resulted in an abortion.

The Court disagrees with that analysis. Applying well settled rules of statutory construction, the Court finds as a matter of law that for purposes of section 1–741(B), ultrasounds are not "medical procedures which result in an abortion."

*See* Order at 1133–1134 (Oct. 31, 1995).

In his motion to reconsider Dr. Short discarded his earlier reliance on the statutory phrase "medical procedures which result in an abortion." He now relies on the following phrase: "medical procedures ... which are in preparation for an abortion." His new argument is, in full:

On pages 1130– 1134 of this court's Order, the application of 63 O.S. § 1–741(B) urged by defendants is misconstrued. The court apparently understands Dr. Short's position to be that his performing an ultrasound is a medical procedure which "would have resulted in an abortion." It is *not* Dr. Short's position that an ultrasound results in an abortion. Rather, 63 O.S. § 1–741(B) *mandates* that there shall be no civil cause of action due to a physician's refusal to participate in any medical procedure (i.e. ultrasound) which *goes on* to result in an abortion *or* is "... in preparation for an abortion." Clearly, an ultrasound does not result in an abortion, but as applied in this case, it is in preparation for an abortion. That is the *only* reason plaintiffs urge it should have been accomplished in this case. According to our proof, there is *no* medical reason to the fetus [sic] requiring performance of an ultrasound prior to the 24th week as opposed to after it is as per Dr. Short's routine. It is respectfully submitted that the court is in error in its ruling that Dr. Short is not entitled to the protection of this statute. The statutory construction urged by Dr. Short *has nothing to do with* a mother's constitutional right to an abortion referenced by the court in its Order.

*See* Motion to Reconsider and/or Clarify Order at 1–2 (Nov. 1, 1995) (emphasis in original).

In sum, Dr. Short's new position is that "as applied in this case, [ultrasounds would have been] in preparation for an abortion." *See* Motion to Reconsider and/or Clarify Order at 2 (Nov. 1, 1995). Stated another way, Dr. Short's new position is simply that:

(1) Had he performed ultrasounds, he would have detected fetal abnormalities.

(2) Had he detected fetal abnormalities, Mrs. Liddington would have elected to have an abortion (performed by some other physician).

(3) Thus, had he performed ultrasounds, they would have been "in preparation for an abortion."

Again, the Court disagrees with Dr. Short's analysis. Again, applying well settled rules of statutory construction, the Court finds as a matter of law that for purposes of section 1–741(B) as applied in this case, ultrasounds are *not* medical procedures which are in preparation for an abortion. This is not to say ultrasounds could never be medical procedures in preparation for an abortion. Rather, under the circumstances of this case, ultrasounds would have been performed in order to detect fetal abnormalities. The detection of fetal abnormalities would have given Mrs. Liddington the opportunity to "make an informed decision either to terminate the pregnancy or to give birth to a potentially defective child" early in her pregnancy. *Keel v. Banach,* 624 So.2d 1022, 1029 (Ala.1993). It is true that in order to prevail on her claim for wrongful birth, Mrs. Liddington must prove to the jury that if Dr. Short had detected the fetal abnormalities, she would have had an abortion. However, that element of proof does not convert ultrasounds to detect fetal abnormalities into medical procedures in preparation for an abortion.

### *Supervening Cause*

■ Next, Dr. Short takes issue with the Court's rejection of his argument that Mrs. Liddington's failure to obtain a third trimester abortion superseded any negligence on his part. In his brief in support of his motion for summary judgment, he argued as follows (reproduced in full):

## PROPOSITION IV

### PLAINTIFFS HAD THE OPTION OF OBTAINING AN ABORTION *AFTER* LEARNING OF THE FETAL ANOMALIES AND, THEREFORE, ANY ALLEGED DELAY IN DIAGNOSING FETAL ANOMALIES ATTRIBUTABLE TO DR. SHORT DID NOT CAUSE DAMAGE TO THE PLAINTIFFS

Title 63 O.S. § 1–732 sets out parameters within which an abortion may be performed in the State of Oklahoma. Section 1–732(A) provides:

A. No person shall perform or induce an abortion upon a pregnant woman after such time as her unborn child has become viable **unless** such abortion is necessary to prevent the death of the pregnant woman **or to prevent impairment to her health.**

Title 63 O.S. § 1–730 provides definitions for Oklahoma's abortion statutes, and therein "health" means physical or *mental health.* Therefore, under Oklahoma law, a physician is able to perform abortions upon pregnant women, even after the pregnancy is presumed viable (24 weeks) if the continued pregnancy may impair the mother's mental health. Herein, plaintiffs have claimed and seek damages for plaintiff Shirley Liddington's mental or emotional health ("non-economic loss" as alleged in plaintiffs' Complaint). Since plaintiffs are maintaining a claim for damages to Shirley Liddington's mental health as a result of the continued pregnancy and delivery of Holly Liddington, such claims would also have entitled plaintiff to have obtained an abortion in Oklahoma after plaintiffs learned of the fetal anomalies herein. Therefore, plaintiffs cannot claim any delay in diagnosing the fetal anomalies, which they assert is the result of negligence on the part of Dr. Short, prevented plaintiffs from obtaining an abortion.

The fact plaintiffs were in Arizona at the time the fetal anomalies were diagnosed does not preclude the applicability of Oklahoma law of access to abortion as provided in section 1–732. Since doctors who practice medicine in this state must conform to Oklahoma law, this Court should look to Oklahoma law in the instant action. *See Spencer v. Seikel,* 742 P.2d [1126] 1129 (Okla.1987).

*See* Brief in Support of Motion for Summary Judgment of Defendants, James E. Short, M.D., and James E. Short, M.D., Inc. at 9-10 (Sep. 1, 1995) (emphasis in original).

At the time the Court entered its October 31, 1995 order, the only evidence on this issue was Mrs. Liddington's testimony that her treating physician in Phoenix informed her, following a meeting of the hospital bioethics committee, that she was too late in the pregnancy for an abortion. Based on this *undisputed* evidence, the Court ruled as follows:

Finally, Dr. Short argues that any negligence on his part was superseded by Mrs. Liddington's failure to obtain a third trimester abortion after her Phoenix physician detected the fetal abnormalities. However, the undisputed evidence is that Mrs. Liddington's Phoenix physicians (as well as the Bioethics Committee of the Phoenix hospital) informed her that she could not legally have an abortion.

The Court finds as a matter of law that Mrs. Liddington's failure to obtain a third trimester abortion does not relieve Dr. Short of liability for his medical negligence, if any.

*See* Order at 1134 (Oct. 31, 1995).

In his motion to reconsider, however, Dr. Short presented evidence that he had not presented with his motion for summary judgment. The new evidence is an excerpt from Dr. Burns' wife's deposition transcript. Mrs. Burns testified she had a telephone conversation with Mrs. Liddington and told Mrs. Liddington "there was a physician in Wichita, Kansas that sees patients at a later term.... He sees pregnancy terminations up to eight months if the mother or the child are in danger." *See* Transcript of Deposition of Deborah Burns at 49–50, attached as exhibit "A" to Motion to Reconsider and/or Clarify Order (Nov. 1, 1995).

For purposes of this order, viewing the evidence in the light most favorable to Dr.

Short, the Court assumes *arguendo* that Mrs. Burns did tell Mrs. Liddington there is a physician in Kansas who does late term abortions if the mother or child are in danger. Moreover, since Dr. Short did not raise a genuine dispute concerning the advice to Mrs. Liddington from her Phoenix physician, the Court also assumes, *arguendo*, that Mrs. Liddington's Phoenix physician did tell her it was too late for her to obtain an abortion.

With this new evidence, Mrs. Liddington's conduct must be analyzed under the law of supervening cause.[1]

In Prosser & Keeton on the Law of Torts, the authors explain the concept of supervening cause as follows:

> If the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances, the defendant may be negligent, among other reasons, because of failing to guard against it; or the defendant may be negligent only for that reason.... In all of these cases [in which the subsequent conduct did not cut off the original tortfeasor's negligence] there is an intervening cause combining with the defendant's conduct to produce the result, and in each case the defendant's negligence consists in failure to protect the plaintiff against that very risk.
>
> Obviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in category will not supersede the defendant's responsibility.

W. Page Keeton *et al.*, Prosser & Keeton on the Law of Torts § 44, at 303–04 (5th ed. 1984).

Similarly, the Tenth Circuit has explained the concept of supervening cause as follows:

> [B]efore a defendant will be liable for a plaintiff's injuries, the plaintiff must prove that his injuries resulted directly and proximately from the defendant's carelessness. The law does not charge a person with all possible consequences of his acts. Rather, the law ignores the remote cause and looks for the proximate cause of the injury.
>
> The proximate cause of an event must be one that in a natural and continuous sequence, unbroken by an independent cause, produces the event and without which the event would not have occurred. Where the negligence complained of only creates a condition which thereafter reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the negligence is the remote rather than the proximate cause thereof. This is held to be true though the injury would not have occurred except for the original act.
>
> Generally, the question of proximate cause is one of fact for the jury.

*Henry v. Merck & Co.*, 877 F.2d 1489, 1494–95 (10th Cir.1989).

■ Thus, in Oklahoma, in order to be deemed a supervening cause, a subsequent act must be independent of the original act, adequate by itself to bring about the injury, and one whose occurrence was not reasonably foreseeable. Applying this law to the facts of this case, Mrs. Liddington's conduct, in not obtaining an abortion based upon the advice of her Phoenix physician (who told her it was too late to obtain a legal abortion) instead of following the advice of Dr. Burn's wife (who told her there is a doctor in Kansas who does late abortions if the mother or child are in danger) does not insulate Dr. Short from liability unless all three of the following elements are true:

1. Mrs. Liddington's conduct was independent of Dr. Short's alleged negligence,

---

1. Oklahoma courts refer to an intervening cause that cuts off the original tortfeasor's liability as "supervening." Other jurisdictions and the Restatement (Second) of Torts § 440 use the term "superseding" to refer to the same concept. *Henry v. Merck & Co.*, 877 F.2d 1489, 1495 (10th Cir.1989).

2. Mrs. Liddington's conduct was adequate of itself to bring about her injury, and

3. Dr. Short could not have reasonably foreseen that Mrs. Liddington would follow the advice of her Phoenix physician over the advice of Dr. Burns' wife.

See *Calandro v. First Community Bank and Trust Co.*, 991 F.2d 640 (10th Cir.1993) (applying Oklahoma law, reversed trial court's finding as a matter of law that the subsequent conduct was not foreseeable); *Henry v. Merck & Co.*, 877 F.2d 1489 (10th Cir.1989) (applying Oklahoma law, reversed judgment on jury verdict in favor of plaintiffs and remanded with instructions to enter judgment in favor of defendant, finding that the subsequent conduct was foreseeable); *Randell v. Tulsa Ind. Sch. Dist. No. 1*, 889 P.2d 1264, 1267 (Okla.Ct.App.1994) (affirmed trial court's finding as a matter of law that the subsequent conduct was not foreseeable), *cert. denied*, January 24, 1995. *See also Graham v. Keuchel*, 847 P.2d 342, 348 (Okla. 1993) (reversed a jury verdict because of an improper supervening cause instruction); *Strong v. Allen*, 768 P.2d 369, 371 (Okla.1989) (a father's negligence was not the supervening cause of injuries to his two year old child); *Thompson v. Presbyterian Hospital, Inc.*, 652 P.2d 260, 264 (Okla.1982) (negligence of an anesthesiologist was the supervening cause of the patient's injuries).

In this case, as in *Strong v. Allen*, none of the elements is true.[2] First, Mrs. Liddington's act of following the advice of her Phoenix physician was not independent of Dr. Short's alleged negligence. "An act is independent when it is not logically compelled by, and does not naturally flow from, the original carelessness. Independence ... means that the intervening act is neither invited by nor

an ordinary response to the original act." *Henry*, 877 F.2d at 1495. Here, the subsequent act was compelled by and naturally flowed from the original act. Dr. Short's alleged failure to detect the fetal abnormalities earlier in Mrs. Liddington's pregnancy is the very event that compelled her to make the decision late in her pregnancy. In other words, had Dr. Short detected the fetal abnormalities earlier in Mrs. Liddington's pregnancy, she would not have been compelled to make the decision in her third trimester.

Second, Mrs. Liddington's conduct was not the cause of her *entire* injury. Even if her failure to obtain an abortion was the proximate cause of any injuries that occurred after she learned of the fetal abnormalities, her conduct did not cause any injuries that occurred prior to the time she learned of fetal abnormalities (*e.g.* additional medical expenses). Thus, her conduct was not adequate of itself to cause the entire injury.

Third, Mrs. Liddington's conduct was foreseeable. The evidence on this issue includes: (a) Mrs. Liddington's testimony that her treating physician in Phoenix informed her, following a meeting of the hospital bioethics committee, that she was too late in the pregnancy for an abortion, and (b) Dr. Burns' wife's testimony that she told Mrs. Liddington there was a physician in Wichita, Kansas who sees pregnancy terminations up to eight months if the mother or the child are in danger. Dr. Burns' wife is not a physician or nurse. This evidence leads to only one reasonable inference. It was entirely foreseeable that Mrs. Liddington would follow the advice of her Phoenix physician, who had conferred with the hospital ethics committee, over the advice of Dr. Burns' wife.[3]

Thus, the Court again finds as a matter of law that Mrs. Liddington's failure to obtain a

---

**2.** In *Strong v. Allen*, 768 P.2d 369 (Okla.1989), none of the three elements was true. A child sustained injuries to his hand from an exposed chain and sprocket mechanism at the back of a coin-operated clothes dryer in the laundry room of the apartment complex where the child's family lived. The accident occurred while the father was unloading clothes from one machine into another. The Oklahoma Supreme Court said: "The father's negligence fails each of these three prongs. First, his lax supervision was not independent of the dangerous condition presented by the exposed mechanism. Second, the father's

negligence was not adequate of itself to bring about the injury without the presence of the dangerous condition. Finally, it was reasonably foreseeable that lax supervision could contribute to a small child's venture into the opening between the dryers where he was injured by the exposed mechanism." *Id.* at 371.

**3.** This inference is bolstered by the undisputed evidence that Mrs. Liddington had earlier followed Dr. Short's advice and continued her pregnancy.

third trimester abortion does not relieve Dr. Short of liability for his medical negligence, if any.[4]

*Holly's Wrongful Life Cause of Action*

Finally, Dr. Short contends that the Court "inappropriately determines what Oklahoma would do with respect to adoption of or recognition of a theory or cause of action for 'wrongful life' and/or 'wrongful birth.'" *See* Motion to Reconsider and/or Clarify Order at 3 (Nov. 1, 1995). Apparently Dr. Short believes the Court held that Oklahoma would recognize wrongful *life* actions. Dr. Short said:

> For example, in Footnote No. 2 the court gratuitously observes "Holly Liddington's *potential* wrongful life claim is not part of this lawsuit" even though the viability of that type of claim or lack of it is not reached in this litigation. "Wrongful life" claims are *not* embraced in any majority rule around the country as the court observes on page 1131 of its Order concerning "wrongful birth" claims. Dr. Short reurges his position set forth in initial briefing in this regard and would appreciate clarification from the court on this point in the event the court was not intending to prejudge the viability of an unasserted claim by way of footnote comment.

*Id.* at 3–4.

In its October 31, 1995 order, the Court said in footnote 2:

> It was not clear from plaintiffs' complaint whether the parents were asserting only their wrongful birth claim or were, instead, asserting both their wrongful birth claim and their child's wrongful life claim. However, in their briefs in response to defendants' motions for summary judgment, the parents have made it clear they are asserting only their wrongful birth claim. *See* Plaintiffs' Brief in Response to Defendant Burns' Motion for Summary Judgment at 7 (Sept. 27, 1995) ("In the present case, plaintiffs seek damages for the wrongful *birth* of their daughter, Holly, with catastrophic neurological birth defects.") (emphasis in original); Plaintiffs' Brief in Response to Defendant Short's Motion for Summary Judgment at 5 (Oct.

2, 1995) ("Plaintiffs hereby adopt their arguments presented under Proposition I of their Brief in Response to Defendant Burns' Motion for Summary Judgment."). Accordingly, Holly Liddington's potential wrongful life claim is not part of this lawsuit.

*See* Order at 1130 n. 2 (Oct. 31, 1995).

In this footnote the Court clarified that despite the ambiguous nature of the allegations in plaintiffs' complaint, the only claim before the Court in this lawsuit is Mr. and Mrs. Liddington's wrongful birth claim and that Holly Liddington's potential wrongful life claim is not part of this lawsuit. The Court expressed no opinion then, and expresses no opinion now, on the issue of whether Oklahoma would recognize a wrongful life claim, since that claim is not before the Court.

### CONCLUSION

The Court has considered Dr. Short's new arguments and has clarified its October 31, 1995 order. Having revisited the issues, the Court DENIES Dr. Short's motion (Doc. #53) and REAFFIRMS its October 31, 1995 order in its entirety.

**IT IS SO ORDERED.**

---

4. This finding is expressly limited to the peculiar facts of this case.